KCMC, INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and the United States of America, Respondent.

No. 78–3037.

United States Court of Appeals,
Fifth Circuit.

Aug. 9, 1979.

Rehearing Denied Oct. 5, 1979.

---

Covington & Burling, Michael S. Horne, J. Geoffrey Bentley, Washington, D. C., for petitioner.

Daniel M. Armstrong, Keith H. Fagan, Attys., Federal Communications Com'n, Washington, D. C., for the F. C. C.

Before SIMPSON, TJOFLAT and HILL, Circuit Judges.

JAMES C. HILL, Circuit Judge:

This case comes before us on a petition for review of a decision by the respondent Federal Communications Commission (FCC), in which the sole issue presented for review is the proper construction of an FCC regulation requiring the divestiture of certain commonly-owned daily newspaper's and commercial television stations.

The petitioner, KCMC, Inc., is a licensee of television broadcast station KTAL–TV (KTAL). KTAL is an NBC network affiliate operating on Channel 6. Its immediate television competitors are KSLA–TV, Channel 12, a CBS affiliate, and KTBS–TV, Channel 3, an ABC affiliate. Together the three stations form what the viewing public and the television industry regard as the Shreveport-Texarkana television market.

KTAL commenced operation on August 16, 1953. Initially its transmitter was located on a relatively short tower in the city of Texarkana, Texas, where it was unable to provide a usable signal as far south as Shreveport. When it became apparent that the station could not economically survive serving this small area, and certainly could not compete effectively with the Shreveport stations, KTAL requested FCC authority to move its transmitter to a taller tower to be constructed about 40 miles south of Texarkana in the direction of Shreveport. The proposed facility, which is essentially the station's present facility, would not produce a city-grade contour [1] encompassing all

---

1. For a variety of regulatory purposes, the FCC has developed and uses various definitions and standards of signal intensity. A signal of only Grade B intensity is expected to produce a good picture at least 90 percent of the time at the best 50 percent of receiver locations or sites. The Grade B contour is an imaginary line, generally in the shape of a circle of which the transmitter site is the center, which marks the outer limits of the area within which a signal of Grade B or better intensity is expected. A stronger Grade A signal should produce a good picture 90 percent of the time at the best 70 percent of receiver locations. The

of Texarkana, Texas, the city of license, as required by the former version of 47 C.F.R. § 73.685(a). However, the FCC granted KTAL's request for a waiver of that requirement on September 23, 1953.

On January 31, 1975, the FCC promulgated regulations dealing with the common ownership of the only television station and the only daily newspaper located in the same community. Although the thrust of the new regulations was directed prospectively to bar the common ownership of newspaper-broadcast combinations in the same community, divestiture was required of existing combinations whenever one party

> as of January 1, 1975 directly or indirectly owns, operates or controls the only daily newspaper published in a community and also as of January 1, 1975, directly or indirectly owns, operates or controls the only commercial television station which places a city-grade signal over the community.

*Second Report and Order* (Docket No. 18110), 50 F.C.C.2d 1046, 1104 (1975) (emphasis added) (hereinafter referred to as Order). Divestiture was considered necessary in these cases because the above-quoted language was thought to include only the most egregious cases, *i. e.,* those in which the newspaper-broadcast combination has an "effective monopoly" in the local "marketplace of ideas as well as economically." *Id.* at 1080.

Appendix D to the Order listed KTAL as one of the seven television stations as to which the divestiture requirement was thought to apply. *Id.* at 1098. Nonetheless, the Order stated that the appendix was not definitive:

> [T]he list is not to be taken as definitive. There may be additional stations within the ambit of the rules that do not have

city-grade encompassment but nonetheless were not found in our search. Conversely, we may have included stations in the list that do not fit within the ambit—that for one reason or another should not have been included. Licensees of such stations can call such situations to our attention.

*Id.* at 1085 n.44.

On February 28, 1975, KTAL filed a motion for a declaratory ruling that the divestiture requirement was inapplicable to KTAL. Although conceding that the *Texarkana Gazette & News* the only daily newspaper in Texarkana, Texas, and KTAL, the only television station licensed to Texarkana, were under common ownership, KTAL nonetheless asserted that it should not be subject to the divestiture requirement because it did not encompass the entire community of Texarkana within its city-grade signal.[2]

With KTAL's motion for declaratory ruling pending, the FCC, on June 5, 1975, issued a *Memorandum Opinion and Order* (Docket No. 18110), 53 F.C.C.2d 589 (1975), disposing of several petitions for reconsideration of the Order. In its opinion, the FCC made clear that intervening circumstances between the January 1, 1975, date used in the divestiture rule and the January 1, 1980, divestiture deadline, would be taken into consideration to the extent that changed circumstances would *eliminate* the divestiture requirement, whereas changed circumstances which would subject additional stations to the divestiture rule would not be considered. *Id.* at 590–91. Furthermore, the FCC amended § 73.636(c) to change the phrase "places a city-grade signal over the community" to "encompassing the entire community with a city-grade signal." *Id.* at 598.

---

Grade A contour, which encompasses the area within which such a signal is expected, is also generally a circle, but a smaller one that lies wholly within the Grade B contour. A so-called city-grade signal should produce a good picture 90 percent of the time at 90 percent of receiver locations; its outer limits are the city-grade contour which encompasses a still small-

er area. *See CBS Television Network Affiliates v. F. C. C.,* 181 U.S.App.D.C. 48, 50 n.5, 555 F.2d 985, 987 n.5 (1977).

**2.** KTAL's request was bottomed on its position that the phrase "places a city-grade signal over the community" meant encompassment of the *entire* community within a city-grade contour.

On December 2, 1975, KTAL filed a supplement to its earlier motion for a declaratory ruling, urging that the editorial change in § 73.636(c) merely confirmed KTAL's interpretation of the original rule.

The FCC chose not to rule on KTAL's request for a declaratory ruling until the validity of the divestiture requirement itself had been decided. On June 12, 1978, the Supreme Court upheld the multiple ownership rules in their entirety as being within the FCC's authority and as being a proper exercise of the FCC's discretion. *F. C. C. v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978).

Following the Supreme Court's decision, the FCC on August 22, 1978, issued a memorandum opinion and order denying KTAL's request for a declaratory ruling in its favor. While conceding that the divestiture rule does not literally apply to KTAL, the Commission held that KTAL should nonetheless be subject to the divestiture requirement because "[t]here is no question that the Commission intended the rule to apply to the Texarkana situation." The petition for review to this Court followed.

■ We approach the issue at hand by noting that, in construing a regulation, we must employ the rules of construction generally applicable to statutes. C. Sands, *Sutherland Statutory Construction* § 31.06 (4th ed. 1972). Thus, where the language selected by the drafters is clear and unequivocal, the courts are bound to give effect to the plain meaning of the chosen words and no duty of interpretation arises. *T. V. A. v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978); *Caminetti v. United States,* 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917); *Diamond Roofing Co. v. Occupational Safety & Health Review Commission,* 528 F.2d 645, 649 (5th Cir. 1976); C.

Sands, *Sutherland Statutory Construction* § 46.01 (4th ed. 1972). Simply put, then, our task is to determine if KTAL comes within the plain meaning of the following regulation:

> No renewal of license shall be granted for a term extending beyond January 1, 1980, to any party that as of January 1, 1975, directly or indirectly owns, operates or controls the only daily newspaper published in a community and also of January 1, 1975, directly or indirectly owns, operates or controls the only commercial television station encompassing the entire community with a city-grade signal.

47 C.F.R. § 73.636(c).

■ Neither party disputes the fact that petitioner owns the only daily newspaper in Texarkana.[3] As to the meaning of the television station ownership requirement, it plainly specifies that the commonly-owned station must encompass the *entire community* (Texarkana) with a city-grade signal as a condition precedent to divestiture. KTAL does not place a city-grade signal over all of Texarkana and the FCC concedes as much.[4] Consequently, KTAL is exempt from the divestiture requirement under the plain language of the regulation.

The FCC charges that such an interpretation is too literal, and draws our attention to the established rule that the plain meaning of a statute or regulation will not be followed where to do so produces an absurd result in clear violation of the intent of the drafters. *See United States v. American Trucking Associations,* 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); C. Sands, *Sutherland Statutory Construction* § 46.07 (4th ed. 1972). We pause to consider the alternative "meanings" suggested by the Commission; after careful analysis, we find our "literal" interpretation to be more consonant with the intent of the divestiture

---

**3.** *See* 47 C.F.R. § 73.636 Note 10.

**4.** Both the opinion of the Commission and the FCC's brief on appeal concede that KTAL does not encompass the entirety of Texarkana within its city-grade contour. As far as we are concerned, that concession places KTAL outside the plain meaning of the divestiture rule.

KTAL alleges in its brief that as of January 1, 1975, more than two-thirds of Texarkana did not receive a city-grade signal from KTAL; and under the new contour prediction method adopted by the FCC, less than one percent of the area would be regarded as within KTAL's city-grade contour.

policy than the constructions urged upon us by the FCC.

First, the FCC argues that KTAL should be subject to divestiture because Texarkana is KTAL's city of license. Since all stations licensed to a community must encompass that entire community with a city-grade signal,[5] the argument goes, the phrase "encompassing the entire community with a city-grade signal" was assumed to also require divestiture whenever a station licensed to a particular community is in common ownership with the only newspaper in that community. But the Commission could have easily included the city of license concept as an alternative predicate for divestiture had it intended that result. In dealing with the divestiture of commonly-owned newspapers and FM Radio stations in 47 C.F.R. § 73.240(c),[6] the Commission made handy use of the city of license concept. To equate, as the FCC suggests, the city of license concept with the encompassment standard would run contrary to the established rule of construction that a term carefully employed in one place and excluded in another should not be implied where excluded. *Diamond Roofing Co. v. Occupational Safety & Health Review Commission*, 528 F.2d 645, 648 (5th Cir. 1976). The separate use of the city of license concept in § 73.240(c) suggests a different meaning for that term and shows an awareness by the Commission that not all stations licensed to a particular community necessarily encompass that community in its entirety by a city-grade signal, since the encompassment standard is subject to waiver. In fact, as the Commission noted in its opinion, the FCC was specifically made aware of this possibility by virtue of KTAL's motion for a declaratory ruling. We therefore conclude that "city of license" is not necessarily subsumed by the use of the phrase "encompassing the entire community with a city-grade signal" in § 73.-636(c).

Second, the FCC argues that the phrase in question refers not to encompassment by the commonly-owned station, but rather to encompassment by an incoming signal from another station. Such an interpretation is not an alternative meaning to the words used, but is an attempt by the Commission to rewrite § 73.636(c). The language used clearly predicates divestiture on owning the only daily newspaper in a community and also owning the only television station encompassing that community with a city-grade signal. We have no doubt that encompassment by an outside station would exempt from divestiture a station otherwise subject to the requirements of § 73.636(c), since the station would then cease to be the *only* one encompassing the city with a city-grade signal. But the commonly-owned station must, in the first instance, be subject to divestiture, and that result may only come about when it encompasses the entire community in question with a city-grade signal. To accept the Commission's suggestion would mean that a commonly-owned station encompassing only a small portion of a community with a Grade B signal would be subject to divestiture unless an outside station encompassed that same community with a city-grade signal, a result rejected by the Commission itself.[7]

5. *See* 47 C.F.R. § 73.685(a).

6. Section 73.240(c) provides:
No renewal of license shall be granted for a term extending beyond January 1, 1980, to any party that as of January 1, 1975, directly or indirectly owns, operates or controls the only newspaper published in a community and also as of January 1, 1975, directly or indirectly owns, operates or controls the only commercial aural station or stations encompassing the entire community with a city-grade signal during daytime hours (predicted or measured signal for AM, predicted for FM). The provisions of this paragraph shall not require divestiture of any interest not in conformity with its provisions earlier than January 1, 1980. Divestiture is not required if there is a separately owned, operated or controlled television broadcast station licensed to serve the community.

7. In its opinion accompanying the promulgation of the divestiture rule, the Commission specifically rejected the attempt to subject commonly-owned stations reaching only a small segment of the community to divestiture. *See Second Order and Report* (Docket No. 18110), 50 F.C.C.2d 1046, 1079 n.28 (1975).

Both of the meanings suggested by the FCC are at odds with the intent of the divestiture rule as it is now structured, because both would require divestiture in cases where the commonly-owned station did not encompass the community with a city-grade signal. In considering the possible approaches to divestiture, the Commission carefully balanced the diversity in viewpoint gained by divestiture [8] against the obvious public benefits promoted by stability and continuity of ownership. Because the Commission was concerned over the disruptive influence of divestiture, it chose to limit divestiture to "only the most egregious cases." *Second Order and Report* (Docket No. 18110), 50 F.C.C.2d 1046, 1080 (1975). Consistent with this approach, then, divestiture would be required only where diversity in viewpoint could realistically be expected to flow from dismantling these newspaper-television combinations. In the words of the Commission, "a mere hoped for gain in diversity is not enough." *Id.* at 1078. Furthermore, a gain in diversity of viewpoint on regional and national issues was not viewed by the Commission to be sufficient, since the goal of divestiture was considered to be the encouragement of divergent views on the issues of *local* concern.

With diversity on local issues as their goal, the Commission selected city-grade encompassment as the determining criterion. The line was drawn here, we are told, because only stations which encompass a community with a city-grade signal can be expected to be responsive to local needs. But requiring divestiture of a commonly-owned station not encompassing the community within its city-grade signal would fail to achieve the goal of diversity, since even under different ownership the station could not be expected to cater to local needs and represent a divergent viewpoint on local issues.[9] Thus, the *sine qua non* of divestiture is city-grade encompassment. Consequently, KTAL is an inappropriate candidate for divestiture under the current version of the regulation.[10]

The FCC contends that it clearly intended to subject KTAL to divestiture, as is shown by its inclusion of KTAL in Appendix D. Yet as we mentioned before, the list of stations contained in Appendix D was not considered to be definitive,[11] and KTAL clearly does not come within the plain meaning of the regulation as drafted. "If the regulation missed its mark, the fault lies in the wording of the regulation—a matter easily remedied under the flexible regulation promulgating structure. . . ." *Diamond Roofing Co. v. Occupational Safety & Health Review Commission*, 528 F.2d 645, 648–49 (5th Cir. 1976). Whether or not the Commission's draftsmen *intended* to accomplish divestiture in the case of a licensee such as KTAL is to be determined by the regulation drafted and ultimately promulgated. As outlined above, the only available conclusion is that the regulation was carefully worded so that *it did not* apply to such a station. If the Commission intends that divestiture be required under the facts here presented, words are available for inclusion in a regulation to accomplish that intent. Whether or not such an intent would be a constructive and lawful one is not, of course, before us for decision.

---

8. The divestiture rule rests on the assumption that "it is unrealistic to expect true diversity from a commonly owned station-newspaper combination. The divergency of their viewpoints cannot be expected to be the same as if they were antagonistically run." *Second Order and Report* (Docket No. 18110), 50 F.C.C.2d 1046, 1079–80 (1975).

9. Similarly, an outside station can be expected to break the local monopoly of a newspaper-television station combination only if it encompasses the community with a city-grade signal, because city-grade encompassment would guarantee an attention to local needs and a resulting divergent viewpoint on matters of local concern.

10. The Commission's explanation of its reasons for choosing the city-grade encompassment standard may be found in the *Second Order and Report* (Docket No. 18110), 50 F.C.C.2d 1046, 1078–83 (1975). *See also F. C. C. v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 803–09, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978).

11. *See Second Order and Report* (Docket No. 18110), 50 F.C.C.2d at 1085 n.44 (1975).

In conclusion, we decline to follow the FCC's interpretation of § 73.636(c) because it is plainly erroneous. *Immigration & Naturalization Service v. Stanisic,* 395 U.S. 62, 89 S.Ct. 1519, 23 L.Ed.2d 101 (1969); C. Sands, *Sutherland Statutory Construction* § 31.06 (4th ed. 1972). We need look no further than the plain meaning of the regulation to see that KTAL does not come within its scope. Therefore the petition is granted and the FCC's order is vacated and set aside.

VACATED.