INTEL CORPORATION AND CONSOLIDATED SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 23010–89.　　　　Filed June 28, 1993.

*Joel V. Williamson, Wayne S. Kaplan, William Albert Schmalzl, Frederick Martin Belmore, Jr., Robert Howard*

Perlman, James P. Fuller, Scott M. Stewart, Thomas Lee Kittle-Kamp, and Catherine Lynne Curtiss, for petitioner.
   William E. Bonano and Mary E. Wynne, for respondent.

OPINION

CLAPP, Judge: This case is before us on the parties' cross-motions for partial summary judgment.

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent determined the following deficiencies in petitioner's Federal income taxes:

| Year | Deficiency |
| --- | --- |
| 1978 | $4,660,900 |
| 1979 | 6,539,152 |
| 1980 | 24,676,625 |

## Procedural Background

This case commenced with the filing of the petition on September 19, 1989. The parties filed a partial settlement stipulation on May 16, 1990. By motion filed May 31, 1990, petitioner asked the Court to sever the export sales source of income issue (export source issue), and by joint motion filed November 5, 1990, the parties asked the Court to sever the allocation of research and experimental expense moratorium issue (R&E allocation moratorium issue). The Court granted these motions on December 17, 1990.

On February 6, 1991, petitioner filed a motion for partial summary judgment on the R&E allocation moratorium issue along with a supporting memorandum of law. On February 11, 1991, respondent filed a motion to stay further proceedings regarding the R&E allocation moratorium issue pending the filing of the Court's opinion in St. Jude Medical, Inc. v. Commissioner, docket No. 5274–89, a separate proceeding which presented the Court with the same legal issue. The Court granted this motion on July 24, 1991. After the opinion was rendered in St. Jude Medical, Inc. v. Commissioner, 97 T.C. 457 (1991), petitioner renewed its motion for partial summary judgment regarding the R&E allocation moratorium issue on January 8, 1992, asking the Court to

reconsider its holding in *St. Jude,* overrule it, and grant partial summary judgment for petitioner on this issue. Respondent also asked for partial summary judgment on the R&E allocation moratorium issue by motion filed January 8, 1992, citing the Court's opinion in *St. Jude.*

By motion and memorandum of law filed January 31, 1992, petitioner also asked for partial summary judgment on the export source issue. After the parties filed a second partial settlement stipulation regarding other issues, on April 13, 1992, respondent filed an objection to petitioner's motion for partial summary judgment on the export source issue and asked the Court to grant partial summary judgment in its favor on that issue. As explained below, the parties' cross-motions for partial summary judgment regarding the export source issue ask the Court to address slightly different issues. Petitioner asks the Court to hold that respondent may not require petitioner to use the allocation method of *Example (1)* of section 1.863-3(b)(2), Income Tax Regs. (hereafter referred to as example (1)), to source its export sales to unrelated parties under the circumstances of this case. Respondent objects to petitioner's motion and asks the Court to hold not only that the above-referenced allocation method is mandatory under the circumstances of this case, but that all of the income earned from petitioner's export sales to unrelated third parties may be sourced domestically under that method.

The issues for decision are:

(1) Whether the moratorium on the allocation of research and experimental expenses to foreign sources imposed by section 223 of the Economic Recovery Tax Act of 1981 (ERTA), Pub. L. 97-34, 95 Stat. 172, 249, applies to the computation of combined taxable income within the meaning of section 994(a)(2) (the R&E allocation moratorium issue). We hold that ERTA section 223 is inapplicable to the computation of combined taxable income within the meaning of section 994(a)(2). *St. Jude Medical, Inc. v. Commissioner, supra,* followed. Accordingly, we deny petitioner's motion for partial summary judgment on that issue and grant respondent's cross-motion for partial summary judgment regarding the R&E allocation moratorium issue.

(2) Whether respondent may require the allocation method of example (1) be used to determine the source of petitioner's

income earned on foreign sales of its goods manufactured domestically, even though petitioner did not maintain a "selling or distributing branch or department" located outside the United States (the export source issue). We hold that respondent cannot require example (1) to be used in such circumstances. Accordingly, and for the reasons stated below, we grant petitioner's motion for partial summary judgment regarding the application of example (1), and deny as moot respondent's motion for partial summary judgment that under example (1) respondent may source all of the income from a sale establishing an independent factory or production price (IFP) to sources within the United States.

## Factual Background

Petitioner is a corporation engaged in the design, manufacture, and sale of semiconductor components and computer systems. At the time the petition was filed, petitioner's principal place of business was Santa Clara, California. For the purposes of these motions, the parties agree that there are no genuine issues of material fact in dispute regarding the issues raised in the cross-motions for partial summary judgment on the R&E allocation moratorium and export source issues, and therefore the parties agree that these issues are ripe for summary judgment. We agree with that assessment. Rule 121(b); *Williams v. Commissioner,* 94 T.C. 464, 465 (1990).

### Facts Regarding the R&E Allocation Moratorium Issue

Intel DISC, Inc. (Intel DISC), operated as a commission DISC within the meaning of section 992(a)(1) during the years at issue. During the years at issue, petitioner was a related supplier of Intel DISC within the meaning of section 1.994-1(a)(3)(ii), Income Tax Regs. As a related supplier of Intel DISC, petitioner paid Intel DISC commissions on some of petitioner's sales that qualified for DISC treatment. Portions of the commissions paid by petitioner to Intel DISC were calculated using the combined taxable income method of section 994(a)(2). Petitioner's first taxable year beginning after the August 13, 1981, effective date of ERTA section 223 was its taxable year ended December 31, 1982. For petitioner's 1982 taxable year, petitioner and Intel DISC did not allocate or

apportion to their combined taxable income any of petitioner's research and experimental expense incurred for research activities conducted in the United States.

*Facts Regarding the Export Source Issue*

During the years at issue, petitioner sold various products that it manufactured within the United States to unrelated parties with title and risk of loss of the products transferring to the buyers outside the United States (third-party export sales). Petitioner did not maintain any selling or distributing branch or department located outside the United States during the years at issue and, therefore, none of petitioner's third-party export sales were made through any such selling or distributing branch or department. In calculating its U.S. corporate income tax liability, petitioner determined the domestic and foreign source of its taxable income from those export sales by applying the apportionment method of *Example (2)* of section 1.863-3(b)(2), Income Tax Regs. (hereafter referred to as example (2)), sourcing part of the income domestically and part abroad. Respondent determined deficiencies for the years at issue by recalculating petitioner's foreign tax credit limitation, sec. 904, after domestically sourcing all of the taxable income earned from petitioner's export sales to unrelated third parties.

*Analysis of the Issues*

*R&E Allocation Moratorium Issue*

This issue presents a question regarding the scope of ERTA section 223: specifically, whether the 2-year suspension or moratorium imposed by ERTA section 223(a) on the otherwise required allocation of research and experimental expenses between a DISC and its related supplier for the purposes of the geographic sourcing of such expenses applies to such an allocation for the purposes of computing "combined taxable income" under section 994(a)(2). The parties' cross-motions for partial summary judgment regarding the R&E allocation moratorium issue recognize that this purely legal issue is the same issue that was decided by this Court in *St. Jude Medical, Inc. v. Commissioner,* 97 T.C. 457 (1991), and that there are no facts or circumstances distinguishing the instant case from *St. Jude* in any material way. *St. Jude* is, therefore,

precedent for the present case in this Court. Petitioner filed a brief amicus curiae in *St. Jude* making substantially the same arguments it makes in this case. Similarly, respondent's arguments here on this issue are substantially the same as those made in *St. Jude*.

We have reviewed the parties' briefs on this issue and have found nothing compelling us to overrule our holding or any part of our opinion in *St. Jude*. Therefore, for the reasons set forth in our opinion in *St. Jude,* we deny petitioner's motion for partial summary judgment on the R&E allocation moratorium issue and grant respondent's motion for partial summary judgment on that issue.

### Export Source Issue

This issue presents the question of whether a domestic manufacturer of personal property which is sold outside the United States must source the income generated by such a sale under example (1), regardless of whether the sale was made through a selling or distributing branch or department located outside the United States. This is a question of first impression. Respondent has ruled that example (1) must be used for the sourcing of such income in every case in which an IFP can be found to exist. Rev. Rul. 88-73, 1988-2 C.B. 173. A revenue ruling is not binding on this Court, however, since it represents only the contention of one party to a case. *United States v. Larionoff,* 431 U.S. 864, 873 (1977); *Crow v. Commissioner,* 85 T.C. 376, 389 (1985).

To decide this issue, we first review the statutory and regulatory framework and history under which this issue arises.

### Statutory Framework and Legislative History

Part 1 of subchapter N, chapter 1, subtitle A (sections 861 through 864[1]) of the Internal Revenue Code sets forth the rules for determining whether the source of income is "within the United States" (domestic source income), or "without the United States" (foreign source income), for purposes of U.S. income taxation. Section 861(a) enumerates specific types of gross income that shall be treated as income from sources

---

[1] Current Code sec. 865 was added by the Tax Reform Act of 1986, Pub. L. 99-514, sec.1211(a), 100 Stat. 2533-2536, and is inapplicable to this case.

within the United States, while section 862(a) enumerates specific types of gross income that shall be treated as income from sources without the United States. Both sections 861(b) and 862(b) allow deductions for expenses, losses, and other such deductions properly apportioned and allocated to the gross income items listed in sections 861(a) and 862(a), respectively (direct expenses), and allow deductions for a ratable part of expenses, losses, and other deductions not definitely allocable to some item of gross income (indirect expenses). The residue, if any, shall be taxable income within the United States, sec. 861(b), or without the United States, sec. 862(b). Section 864 provides certain definitions not at issue in this case.

Section 863 sets forth source rules for those items of gross income, expenses, losses, and deductions not enumerated in sections 861(a) and 862(a). Section 863 provides in pertinent part:

SEC. 863. ITEMS NOT SPECIFIED IN SECTION 861 OR 862.

(a) ALLOCATION UNDER REGULATIONS.—Items of gross income, expenses, losses, and deductions, other than those specified in sections 861(a) and 862(a), shall be allocated or apportioned to sources within or without the United States, under regulations prescribed by the Secretary. Where items of gross income are separately allocated to sources within the United States, there shall be deducted (for the purpose of computing the taxable income therefrom) the expenses, losses, and other deductions properly apportioned or allocated thereto and a ratable part of other expenses, losses, or other deductions which cannot definitely be allocated to some item or class of gross income. The remainder, if any, shall be included in full as taxable income from sources within the United States.

(b) INCOME PARTLY FROM WITHIN AND PARTLY FROM WITHOUT THE UNITED STATES.—In the case of gross income derived from sources partly within and partly without the United States, the taxable income may first be computed by deducting the expenses, losses, or other deductions apportioned or allocated thereto and a ratable part of any expenses, losses, or other deductions which cannot definitely be allocated to some item or class of gross income; and the portion of such taxable income attributable to sources within the United States may be determined by processes or formulas of general apportionment prescribed by the Secretary. Gains, profits, and income—

\* \* \* \* \* \* \*

(2) from the sale or exchange of personal property produced (in whole or in part) by the taxpayer within and sold or exchanged without the United States, \* \* \*

\* \* \* \* \* \* \*

shall be treated as derived partly from sources within and partly from sources without the United States.

The statutory structure for determining source uses section 863 to source all items of income, expense, loss, or deduction not enumerated in section 861 or 862. Thus, section 863 is the catchall or "residual" source determination section. The first sentence of section 863(a) requires that all such nonenumerated items "shall be allocated or apportioned to sources within or without the United States". This treatment is mandatory for determining the source of all items governed by section 863. However, rather than design specific sourcing rules for those items itself, Congress chose to have respondent promulgate such sourcing rules by regulation. In section 863(b), Congress described certain types of transactions that give rise to "income partly from within and partly from without the United States". Included in this description were "gains, profits, and income" from the sale or exchange of personal property produced by the taxpayer within the United States and sold outside the United States (export sales), or vice versa (import sales). Collectively, these are referred to as cross-border sales. Congress provided that a portion of such taxable income be sourced domestically as determined by "processes or formulas of general apportionment prescribed by the Secretary." Sec. 863(b). The remainder is foreign sourced taxable income.

Most of present-day section 863 was enacted by section 217(e) of the Revenue Act of 1921, ch. 136, 42 Stat. 227, 244-245. By its terms, section 217(e) of the Revenue Act of 1921 applied only to nonresident aliens, but the sourcing rules therein were subsequently made applicable to U.S. taxpayers by a statutory cross-reference incorporating the sourcing rules for purposes of applying the foreign tax credit provisions. Revenue Act of 1932, ch. 209, sec. 131(e), 47 Stat. 212. The pertinent provisions contained in section 217(e) have been retained in the Internal Revenue Code without material alteration.

The legislative history of the Revenue Act of 1921 makes clear the mixed-source directive of section 217(e) for cross-border sales. Prior to the enactment of the Revenue Act of 1921, there was no specific sourcing rule for cross-border sales. The Revenue Act of 1918, ch. 18, secs. 213(c) and

233(b), 40 Stat. 1066, 1077, treated "profits on the manufacture and disposition of goods within the United States" as domestic source income. The legislative history of the Revenue Act of 1921 indicates that Congress was dissatisfied with the failure of the 1918 source rule to separate the source of income attributable to the manufacturing activities from the source of income attributable to sales activities in the case of cross-border sales. In an analysis prepared by the Secretary of the Treasury for the House Ways and Means Committee entitled "Notes on the Revenue Act of 1918" and submitted on November 3, 1918, the Secretary suggested that the income components of cross-border sales "be determined by processes of allocation or apportionment under administrative regulations." Seidman, Seidman's Legislative History of Federal Income Tax Laws 1938-1861, at 776, 848 (1938). Further dissatisfaction with the 1918 source rule was evidenced by the testimony of Dr. Thomas Sewall Adams[2] before the Senate Finance Committee, which criticized an opinion of the Attorney General of the United States regarding that rule. In that opinion, 32 Op. Atty. Gen. 336 (1920), the Attorney General ruled that the income of a foreign corporation from the cross-border sales of goods it produced in the United States and sold abroad was totally foreign source because such profits were not on "the manufacture *and disposition* of goods within the United States." (Emphasis added.) Revenue Act of 1918, ch. 18, sec. 233(b), 40 Stat. 1077.[3] The Senate Finance Committee's report on section 217(e) of the Revenue Act of 1921 confirms the committee's dissatisfaction with the 1918 act's source rule:

The present law [the 1918 act's source rule] is both obscure and economically unsound, inasmuch as the Attorney General has held that where goods are manufactured or produced in the United States and sold abroad,

---

[2] See Hearings on H.R. 8245 Before the Senate Comm. on Finance, 67th Cong., 1st Sess. 309-310 (Sept. 1-Oct. 1, 1921), (statement of Dr. T.S. Adams, Economic Advisor of the Treasury Department). Dr. Adams was the only witness before the Senate Finance Committee in closed hearings on the bill that became the Revenue Act of 1921, ch. 136, 42 Stat. 2271. In those hearings, he went through the bill with the Finance Committee section by section, and the Senate Finance Committee and the House Ways and Means Committee relied heavily on him for authoritative explanation of the bill. He has often been referred to as the "father" of the 1921 act. See *Phillips Petroleum Co. v. Commissioner,* 97 T.C. 30, 46 (1991) (Parker, J., dissenting).

[3] It should be noted that in Notes on the Revenue Act of 1918, Seidman, Seidman's Legislative History of Federal Income Tax Laws 1938-1861, at 776 (1938), the Secretary of the Treasury would have reached the exact opposite result under the 1918 act's source rule, i.e., solely domestic sourced income. The Secretary so concluded when discussing a hypothetical foreign entity manufacturing goods in the United States and selling them abroad. *Id.* at 848.

no part of the profit is derived from a source within the United States. This section [section 217 of the 1921 act] explicitly allocates certain important sources of income to the United States or to foreign countries, as the case may be, and with respect to the remaining income (particularly that derived partly from sources within and partly from sources without the United States) authorizes [in section 217(e)] the Commissioner, with the approval of the Secretary, to determine the income derived from sources within the United States either by rules of separate allocation or by processes or formulas of general apportionment.

S. Rept. 275 (Vol. 1), 67th Cong., 1st Sess. 16 (1921), 1939-1 C.B. (Part 2) 181, 192. Substantially the same passage appears in the report of the House Committee on Ways and Means. See H. Rept. 350 (Vol. 2), 67th Cong., 1st Sess. 12 (1921), 1939-1 C.B. (Part 2) 168, 177.

In writing section 217(e) of the Revenue Act of 1921, Congress made clear that the uncertain result under prior law (all domestic source income or all foreign source income, depending on whose opinion was solicited), was unsound, undesirable, and not reflective of economic reality. Congress recognized that cross-border sales income has more than one situs—the situs of manufacture and the situs of marketing. The mixed-source directive of section 217(e) was drafted in recognition of this economic reality.

*Regulatory Framework and Legislative History*

Regulations were promulgated under the newly enacted section 217(e) in 1922.[4] The "methods of allocation or appor-

---

[4] As originally promulgated, Regs. 62, art. 327 (1922), stated:

Income derived from sources partly within and partly without the United States.—Items of gross income not allocated by articles 316-323 or 326 to sources within or without the United States shall (unless unmistakably from a source within or a source without the United States) be treated as derived from sources partly within and partly without the United States, according to the following rules and cases:

*Manufacturers and producers.*—Gross income derived from the sale of personal property produced (in whole or in part) by the taxpayer within and sold without the United States, or produced in whole or in part by the taxpayer without and sold within the United States shall be treated as derived partly from sources within and partly from sources without the United States, under one of the cases named below. As used herein, the word "produced" includes created, fabricated, manufactured, extracted, processed, cured, or aged.

Case 1: Where the manufacturer or producer regularly sells part of his output to wholly independent distributors or other selling concerns in such a way as to establish fairly an independent factory or production price—or shows to the satisfaction of the Commissioner that such an independent factory or production price has been otherwise established—unaffected by considerations of tax liability, and the selling or distributing branch or department of the business is located in a different country than that in which the factory is located or the production carried on, the net income attributable to sources within the United States shall be computed by an accounting which treats the products as sold by the factory or productive department of the

tionment" respondent crafted took the form of three "cases" (now called "Examples") in the regulations. With one material alteration discussed below, those methods of allocation or apportionment have remained substantially the same from the date of their promulgation in 1922 until today.

Respondent effectuated Congress' mixed-source directive for cross-border sales using those three cases. Regs. 62, art. 327 (1922). Case 1 and case 2 are substantively identical to *Example (1)* and *Example (2)* of section 1.863-3(b)(2), Income Tax Regs. with one exception: case 2 was altered in 1957 to conform to the 1957 promulgation of the "title passage rule"

---

business to the distributing or selling department at the independent factory price so established. In all such cases the basis of the accounting shall be fully explained in a statement attached to the return.

Case 2: Where an independent factory or production price has not been established as provided under case 1, the net income shall first be computed by deducting from the gross income derived from sources partly within and partly without the United States the expenses, losses, or other deductions properly apportioned or allocated thereto and a ratable part of any expenses, losses, or other deductions which can not definitely be allocated to some item or class of gross income. Of the amount of net income so determined, one-half shall be apportioned in accordance with the value of the taxpayer's property within and without the United States, the portion attributable to sources within the United States being determined by multiplying such one-half by a fraction the numerator of which consists of the value of the taxpayer's property within the United States and the denominator of which consists of the value of the taxpayer's property both within and without the United States. The remaining one-half of such net income shall be apportioned in accordance with the gross sales of the taxpayer within and without the United States, the portion attributable to sources within the United States being determined by multiplying such one-half by a fraction the numerator of which consists of the taxpayer's gross sales for the taxable year or period within the United States, and the denominator of which consists of the taxpayer's gross sales for the taxable year or period both within and without the United States. "Gross sales within the United States" means the aggregate amount of all sales made during the taxable year which were principally secured, negotiated or effected by employees, agents, offices, or branches of the taxpayer's business resident or located in the United States.

The term "property" as used in this article includes only the property held or used to produce income which is derived from sources partly within and partly without the United States (excluding all property held or used to produce income which is allocated or apportioned under other articles or paragraphs of these regulations). Such property should be taken at its actual value, which in the case of property valued or appraised for purposes of inventory, depreciation, depletion, or other purposes of the Revenue Act of 1921 shall be the highest amount at which so valued or appraised, and which in other cases shall be deemed to be its book value in the absence of affirmative evidence showing such value to be greater or less than the actual value. The average value during the taxable year or period shall be employed. The average value of property as above prescribed at the beginning and end of the taxable year or period ordinarily may be used, unless by reason of material changes during the taxable year or period, such average does not fairly represent the average for such year or period, in which event the average shall be determined upon a monthly or daily basis. Bills and accounts receivable shall (unless satisfactory reason for a different treatment is shown) be assigned or allocated to the United States when the debtor resides in the United States, unless the taxpayer has no office, branch or agent in the United States.

Case 3: Application for permission to base the return upon the taxpayer's books of account will be considered by the Commissioner in the case of any taxpayer who, in good faith and unaffected by considerations of tax liability, regularly employs in his books of account a detailed allocation of receipts and expenditures which reflects more clearly than the processes or formulas prescribed under cases 1 and 2, the income derived from sources within the United States.

in section 1.861-7(c), Income Tax Regs., which applies to all of part 1 (sections 861-864), subchapter N, chapter 1, of the Internal Revenue Code. Additionally, case 3 is substantively identical to *Example (3)* of section 1.863-3(b)(2), Income Tax Regs.

Under the first method (case 1), income from a cross-border sale was divided between the manufacturing component and the marketing component by means of a hypothetical deemed sale utilizing an IFP when one could be established and the cross-border sale was made through a selling or distributing branch or department in a country different from the place of manufacture. Under the second method (case 2), income was divided in half to separate the manufacturing and marketing components. The manufacturing component was sourced in accordance with the location of the taxpayer's property used in connection with the relevant transaction, and the marketing component was sourced where the relevant sale was "principally secured, negotiated or effected by employees, agents, offices, or branches of the taxpayer's business".[5] The third method employed an allocation based on the taxpayer's books of account with the requisite approval of respondent.

The regulatory apportionment methods realized Congress' mixed-source directive. Congress intended respondent to draft regulations that provided a mixed-source result for situations where activities occurred in different countries. All of the methods accomplished that task. They simply utilized different techniques to measure the amounts of each component based upon the facts of each case. By contrast, where these activities were performed in the same country, Congress intended the income to be sourced solely in that country.

When the title passage rule was promulgated in 1957, sec. 1.861-7(c), Income Tax Regs., respondent changed example (2). Significantly, we note that no similar change was made to the different country branch requirement in example (1). In modifying one of these regulatory source rules, respondent must be presumed to have carefully reviewed all of them.

---

[5] This part of the second method was changed to reflect the promulgation of the title passage rule in 1957. Sec. 1.861-7(c), Income Tax Regs. Under *Example (2)* of sec. 1.863-3(b)(2), Income Tax Regs., as it now stands, apportionment almost always produces a 50-50 split between foreign and domestic source.

Therefore, we must infer that respondent intentionally retained the different country branch requirement in example (1). This is especially true because the prior language of example (2) ("principally secured, negotiated or effected by employees, agents, offices, or branches of the taxpayer's business") required significant contact and activity in the country where the goods were sold in order for that portion of the income to be sourced there. Thus, there was significant parallelism between the prior language of example (2) and the different country branch requirement of example (1). Retaining the different country branch requirement in example (1) is consistent with the structure of example (1) and the way it accomplishes the mixed-sourced directive (i.e., use of a deemed sale between two segments of an entity).

## Discussion

The grant of legislative rule-making authority by Congress in section 863(a), while broad, is not plenary; it can be exercised only within the parameters set forth by Congress in section 863, including section 863(b). In *Phillips Petroleum Co. v. Commissioner,* 97 T.C. 30 (1991), we noted that the section 863(a) congressional grant of authority could "be seen as inconsistent with the provisions of section 863(b) which state certain types of gains, profits, and income—items not specified in sections 861(a) and 862(a)—that shall be treated as partly from sources within and partly from sources without the United States." *Id.* at 34-35. We resolved any possible inconsistency, however, "by construing the section 863(b) sourcing rules as not contradicting, but modifying and necessarily constraining the section 863(a) delegation of authority." *Id.* at 35.

Example (1) is not an elective method of apportionment applicable only at the option of a taxpayer, but rather must be used when all the factual prerequisites are present. *Id.* at 38. Petitioner argues that the plain language of example (1) requires that the cross-border sales be made through a selling or distributing branch or department located in a country different from where the taxpayer manufactured the goods in order for its sourcing rule to apply. Thus, petitioner contends that absent a different country branch, example (1) cannot apply. Respondent asserts, however, that a cross-border sale

of goods with respect to which an IFP exists is the only condition necessary to make that example applicable. Respondent also contends that example (1) is applicable to a sale that itself establishes an IFP. Respondent further maintains that all of petitioner's cross-border sales income may be sourced domestically under example (1). We were not presented with these questions in *Phillips Petroleum Co. v. Commissioner, supra,* because the parties in that case assumed, for purposes of their cross-motions for summary judgment on which the opinion was rendered, that all of the factual prerequisites for the application of example (1) were present. *Id.* at 37.[6]

We hold that the plain language of example (1) requires both that an IFP exist with respect to the goods sold and that the sale be made through a selling or distributing branch or department for a cross-border sale to be sourced by example (1). These requirements are consistent with Congress' desire to provide mixed-source treatment for cross-border sales. Since petitioner's required cross-border sales were not made through such a branch or department, example (1) may not be used to source the income generated thereby. Because we hold that example (1) may not be applied to source petitioner's third-party export sales at issue here, we need not reach the question of whether respondent may domestically source all of the income generated by petitioner's sales. However, we note in passing that respondent's ultimate objective would run counter to the express language of section 863(b) requiring a mixed-source result for cross-border sales and is therefore self-defeating.

We reach this conclusion for the following reasons. As noted above, section 863 limits respondent's authority to promulgate sourcing rules; Congress constrained the present-day section 863(a) delegation of authority by providing mixed-source treatment for cross-border sales in section 863(b). *Phillips Petroleum Co. v. Commissioner, supra.*

---

[6] We note that the Department of the Treasury released "Report to the Congress on the Sales Source Rules" on Jan. 13, 1993. The study was mandated by sec. 1211(d) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2536, concerning the export sales sourcing rules. That study concludes that our holding in *Phillips Petroleum Co. v. Commissioner,* 97 T.C. 30 (1991), compels the application of *Example (1)* of sec. 1.863-3(b)(2), Income Tax Regs., whenever an independent factory price (IFP) exists, regardless of whether the instant sale is made through a different country branch. The Treasury study also concludes that *Phillips Petroleum* holds that cross-border sales establishing an IFP can themselves be sourced under example (1). Treasury Study at 2. 8. 9. To the extent that the Treasury study reads *Phillips Petroleum* as compelling these results, we disagree.

Respondent promulgated regulations in 1922 pursuant to that grant of authority which implemented Congress' objective, and those regulatory sourcing rules remain substantially the same today. The plain language of example (1) requires that two conditions exist for its apportionment method to be applicable: An IFP must be established with respect to the goods sold, *and* the goods must be sold through a selling or distributing branch or department located in a different country from that in which the factory is located or production of the goods occurred. Respondent may not ignore these requirements as set forth in the plain language of the regulations any more than petitioner or other taxpayers.

The statutory language contained in section 217(e) of the Revenue Act of 1921 has been reenacted in each successive revenue act without material alteration, finally appearing in section 863. Similarly, the regulatory language respondent first promulgated in 1922 has been repromulgated in successive regulations with only the one change noted above, finally appearing in section 1.863-3(b), Income Tax Regs. Because Congress expressly delegated authority to promulgate regulations to implement its mixed-source directive for cross-border sales, these regulations are legislative in character and are afforded the force and effect of law so long as they are not inconsistent with the statute. *Rowan Cos. v. United States,* 452 U.S. 247, 253 (1981); *Brown-Forman Corp. v. Commissioner,* 94 T.C. 919, 942-943 (1990), affd. 955 F.2d 1037 (6th Cir. 1992). The rules for interpreting a legislative regulation are, in essence, similar to those governing the interpretation of statutes. *KCMC, Inc. v. FCC,* 600 F.2d 546, 549 (5th Cir. 1979); *General Elec. Co. v. United States,* 221 Ct. Cl. 771, 610 F.2d 730, 733-734 (1979).

The most basic tenet of statutory construction is that the starting point for interpreting a statute is the language of the statute itself. *Consumer Prod. Safety Commn. v. GTE Sylvania, Inc.,* 447 U.S. 102, 108 (1980). The Supreme Court has said that absent absurd, unreasonable, or futile results, there is "no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." *United States v. American Trucking Associations,* 310 U.S. 534, 543 (1940); see also *Taft v. Commissioner,* 304 U.S. 351, 359 (1938). When the plain language of the statute is clear and unambiguous, that is

where the inquiry should end. *United States v. Ron Pair Enterprises,* 489 U.S. 235, 241 (1989). In reaching our holding, we find the language of example (1) clear and unambiguous:

*Example (1).* Where the manufacturer or producer regularly sells part of his output to wholly independent distributors or other selling concerns in such a way as to establish fairly an independent factory or production price—or shows to the satisfaction of the district director (or, if applicable, the Director of International Operations) that such an independent factory or production price has been otherwise established—unaffected by considerations of tax liability *and* the selling or distributing branch or department of the business is located in a different country from that in which the factory is located or the production carried on, the taxable income attributable to sources within the United States shall be computed by an accounting which treats the products as sold by the factory or productive department of the business to the distributing or selling department at the independent factory price so established. In all such cases the basis of the accounting shall be fully explained in a statement attached to the return for the taxable year. [Sec. 1.863-3(b)(2), Income Tax Regs.; emphasis added.]

Grammatically, the import of the first sentence of example (1) is unmistakable. The conjunction "and" links two dependent clauses which modify the independent clause. The subordinating conjunction "where", which begins the sentence, establishes the relationship between the two dependent clauses and the independent clause. Therefore, it is clear that the structure of this sentence requires both dependent conditions to exist for the operative rule of the independent clause to govern.

Moreover, the provisions of the whole law and its objectives and policy support this conclusion regarding the operation of example (1) of the regulation. As discussed above, example (1) was promulgated in 1922 under a congressional grant of authority in section 217(e) of the Revenue Act of 1921. That statute provided, and its successors have continued to provide, a mixed-source directive for cross-border sales. Example (1) effectuates that purpose by requiring a condition to exist, i.e., the cross-border sales made through a different country branch, so that the regulatory apportionment of the source of income approximates its actual economic genesis. It may not be the only sourcing rule, and it may not be to respondent's current liking, but it is a valid implementation of the intent of Congress. Our review of the

legislative history of the statute which evidences Congress' desire to enact a mixed-source sourcing scheme for cross-border sales indicates the different country branch requirement of example (1) was intentionally designed to accomplish that goal. Rather than causing absurd, unreasonable, or futile results, example (1) fulfills the expressed desire of Congress for mixed-source treatment of cross-border sales, and harmonizes with the plain language of the statute, its origin, and its purpose. *National Muffler Dealers Association v. United States,* 440 U.S. 472, 477 (1979). As such, the regulation qualifies as a "contemporaneous construction of the statute by those presumed to have been aware of congressional intent." *Id.*; see also *Rowan Cos. v. United States, supra* at 253.

Respondent attempts to justify disregarding the different country branch requirement of example (1) by arguing that example (1) "allocates" gross income to sources within the United States, rather than "apportioning" net income to sources within or without the United States as is the case under example (2). In attempting to make substance of this distinction, respondent asserts that example (1) is an "allocation" method promulgated pursuant to section 863(a), rather than an "apportionment" method under section 863(b). Therefore, respondent contends that the gross income generated from export sales establishing an IFP can be entirely domestically sourced under authority of section 863(a) regardless of whether such sales were made through a foreign selling or distributing branch or department.

We find respondent's allocation versus apportionment distinction to be a distinction without a difference, and we disagree that example (1) was designed to source gross income entirely domestically under section 863(a). Both the Code and the regulations use the terms "allocation" and "apportionment" synonymously in many instances. See, e.g., secs. 861(b), 862(b), and 863(a) and (b); secs. 1.863-1(a), 1.863-2(a), 1.863-3(a)(1) and (b), Income Tax Regs. Furthermore, while section 863(a) provides authority for regulations, there is nothing in example (1) indicating that it was intended to source cross-border sales domestically under section 863(a) rather than provide a mixed-source result under section 863(b). To the contrary, we hold that example (1) was promulgated to effectuate Congress' mixed-source directive

for cross-border sales like those in the present case. We also note that section 1.863-3, Income Tax Regs., within which example (1) is located, is entitled "Income from the sale of personal property derived partly from within and partly from without the United States", essentially the same title as that used for subsection (b) of section 863. Moreover, there is nothing in respondent's allocation versus apportionment argument which negates the plain language of the different country branch requirement of example (1). As we held in *Phillips Petroleum Co. v. Commissioner,* 97 T.C. 30 (1991), section 863(b) modified and constrained the section 863(a) delegation of authority. Petitioner's export sales are clearly the type of cross-border sales for which Congress provided a mixed-source directive. Example (1), with its conjunctive conditions, realizes that directive.

Respondent also points to the introductory language of example (2) to justify ignoring the different country branch requirement,[7] and asserts that it confirms that example (1) controls the sourcing of cross-border sales in every case where an IFP can be established. Respondent argues that petitioner's reading of example (1) leaves a specific class of cross-border sales beyond the reach of both example (1) and example (2): those sales for which an IFP exists but are not made through a different country branch. The introductory language to example (2), however, does not alter the requirements of example (1), but merely serves to introduce the sourcing methodology applicable when example (1) is not applicable (and if example (3) is not utilized). The introductory language to which respondent points regarding the IFP is qualified by the clause "as provided in Example (1)." We do not construe this clause in example (2) to mean that the plain language of example (1) imposing the different country branch requirement is to be ignored. Thus, we conclude that the introductory language of example (2) simply refers to the fact that example (2) shall be used if the requirements of example (1) are not met.

---

[7] Sec. 1.863-3(b)(2), *Example* (2), Income Tax Regs., begins: "Where an independent factory or production price has not been established as provided in Example (1)".

The regulation must be applied in accordance with the plain meaning of its terms. To reflect the foregoing,

> *An order will be issued denying petitioner's motion for partial summary judgment on the R&E allocation moratorium issue, granting respondent's motion for partial summary judgment on the R&E allocation moratorium issue, denying respondent's motion for partial summary judgment on the export source issue, and granting petitioner's motion for partial summary judgment on the export source issue.*