106 T.C. No. 1

UNITED STATES TAX COURT

THE COCA-COLA COMPANY, AND INCLUDIBLE SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 299-94.                    Filed January 4, 1996.

P filed a motion for partial summary judgment
relating to the computation of combined taxable income
under sec. 936(h)(5)(C)(ii), I.R.C., with respect to
syrup and soft-drink concentrate produced by P's sec.
936, I.R.C., subsidiary, Caribbean Refrescos, Inc.
1. <u>Held</u>: Sec. 1.936-6(b)(1), Q&A-12, Income Tax
Regs., governs the computation of combined taxable
income with respect to sales of component concentrate
to unrelated third parties.
2. <u>Held</u>, <u>further</u>, sec. 1.936-6(b)(1), Q&A-12,
Income Tax Regs., requires U.S. affiliate expenses to
be allocated and apportioned to the component
concentrate by applying the production cost ratio to

all expenses allocable and apportionable to the integrated product; i.e., bottle and can soft drink.

3. Held further, sec. 1.936-6(b)(1), Q&A-12, Income Tax Regs., requires U.S. affiliate expenses allocable and apportionable to the integrated product, i.e., bottle and can soft drink, to be determined under sec. 1.861-8, Income Tax Regs., as described in sec. 1.936-(6)(b)(1), Q&A-1, Income Tax Regs.

4. Held, further, P may net interest income against interest expense in determining the amount of the interest deduction to be allocated and apportioned in computing combined taxable income under sec. 936, I.R.C., and sec. 1.861-8(e)(2), Income Tax Regs. Bowater Inc. v. Commissioner, 101 T.C. 207 (1993).

Charles W. Hall, William S. Lee, Nancy T. Bowen, William P. McClure, Herman B. Bouma, and Gregory J. Ossi, for petitioner.

Beth Williams, H. Steven New, and David P. Fuller, for respondent.

OPINION

WRIGHT, Judge: This matter is before the Court on petitioner's motion for partial summary judgment filed under Rule 121.[1] This case was heard at a motions session held on February

[1]Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code in effect during the years in issue.

23, 1995, at Washington, D.C.[2]  Petitioner's motion was taken under advisement.

Summary judgment is intended to expedite litigation and avoid unnecessary and expensive trials.  Florida Peach Corp. v. Commissioner, 90 T.C. 678, 681 (1988).  Summary judgment may be granted with respect to all or any part of the legal issues in controversy "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law."  Rule 121(b); Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994); Zaentz v. Commissioner, 90 T.C. 753, 754 (1988).  The moving party bears the burden of proving that there is no genuine issue of material fact, and factual inferences will be read in a manner most favorable to the party opposing summary judgment. Dahlstrom v. Commissioner, 85 T.C. 812, 821 (1985).  The facts presented below do not appear to be in dispute, are stated solely for purposes of deciding the motion, and are not findings of fact for this case.  Fed. R. Civ. P. 52(a); Sundstrand Corp v. Commissioner, supra at 520.

I. Background

---

[2]In addition, the Court considered an amicus curiae brief filed by PepsiCo.

Petitioner owns bottling companies known as company bottling operations (CBO's), each of which is a domestic corporation owned or controlled directly or indirectly by petitioner. Petitioner's principal place of business is Atlanta, Georgia. Caribbean Refrescos, Inc. (CRI), is a wholly owned subsidiary of petitioner.

CRI produces soft-drink concentrate in Puerto Rico and transfers all of the concentrate for the U.S. market to Coca-Cola USA (sometimes referred to as USA), an unincorporated division of petitioner. Coca-Cola USA sells concentrate, in unchanged form, to CBO's and to unrelated independent bottling companies engaged in producing syrup and selling such syrup to wholesalers. Coca-Cola USA converts the remainder of the concentrate into fountain syrup and sells the syrup to unrelated bottlers and CBO's. Fountain syrup is a combination of concentrate, high fructose corn syrup, and water. Syrup is mixed with carbonated water at retail outlets to produce the fountain soft drink sold to consumers. During the years at issue, the dilution ratio for Coke, Diet Coke, Caffeine Free Diet Coke, Cherry Coke, and Diet Cherry Coke was 1:79.26:515. Thus, one unit of concentrate is processed into 79.26 gallons of syrup, which is further processed into 515 gallons of soft drink. Regardless of the form of the product sold, each sale involves exactly one unit of concentrate.

The CBO's that purchase concentrate from Coca-Cola USA convert the concentrate into fountain syrup and sell the syrup to

unrelated retailers. The CBO's that purchase fountain syrup sell the fountain syrup to unrelated retailers.

CRI is both the possessions corporation and the electing corporation within the meaning of section 936. Under section 1504(b), a section 936 possessions corporation is required to file a separate U.S. corporate return and is therefore ineligible to join in the parent corporation's consolidated return.

The issues before us for partial summary judgment arise out of the section 936 tax credit, which is designed to encourage investment and employment in Puerto Rico and other possessions of the United States. The amount of the credit is derived from the amount of the "combined taxable income" (sometimes referred to as CTI) derived from the "possession product". The primary dispute in the instant case involves the dividing of income and expenses between related parties. More specifically, the dispute involves whether the use of a formulaic calculation, or rather a calculation based upon factual relationships, is mandated in order to obtain the proper allocation and apportionment of expenses to the gross income derived from the sale of a component possession product by a U.S. affiliate.

Petitioner filed its Federal income tax returns for taxable years 1983 through 1986 relying in part on section 1.936-6(b)(1), Q&A-12, Income Tax Regs. (Q&A-12). Respondent issued a deficiency notice to petitioner in 1991 for taxable years 1983 and 1984. Petitioner filed a motion for partial summary judgment

in that prior case, docket No. 17171-91, similar to the one filed in the instant case. Respondent thereafter conceded the prior case in November 1992. On November 10, 1992, the Commissioner opened a regulation project with respect to the computation of combined taxable income under section 936(h). In October 1993, respondent issued the notice of deficiency in the instant case, determining deficiencies in petitioner's Federal income taxes for 1985 and 1986 in the amounts of $30,504,383 and $42,640,008, respectively. Respondent determined that petitioner was not entitled to the amount of the section 936 tax credit claimed on its returns for the years at issue. The petition in the instant case was filed January 4, 1994. On January 12, 1994, respondent's proposed amendment to Q&A-12 was published in the Federal Register. See infra note 5.

A secondary dispute in the instant case involves the treatment of interest expense with respect to computing combined taxable income under section 936. We are asked to decide whether petitioner may net interest income against interest expense in determining the amount of interest deduction to be allocated and apportioned in computing combined taxable income. Respondent contends that interest netting violates section 1.861-8(e)(2), Income Tax Regs., and petitioner must allocate and apportion the amount of its gross interest expense in determining combined taxable income. As a preliminary matter, we summarily reject respondent's argument and find, without further analysis, on the

basis of <u>Bowater Inc. v. Commissioner</u>, 101 T.C. 207 (1993), that petitioner may net interest income against interest expense in determining the amount of interest deduction to be allocated and apportioned in computing combined taxable income under section 936 and section 1.861-8(e)(2), Income Tax Regs. See also <u>General Portland Cement Co. v. United States</u>, 628 F.2d 321 (5th Cir. 1980).

<u>II. Discussion</u>

    <u>A. Section 936 and Section 1.936-6(b)(1) Q&A 1 & 12, Income Tax Regs.</u>

    Under the statutory scheme of section 936, a U.S. corporation, such as CRI, which elects the application of section 936 and meets certain requirements with respect to operating in a possession, is entitled to a credit against the U.S. tax on certain possession-related income. Section 936 provides the following:

> SEC. 936(a). Allowance of Credit.--
>
>     (1) In General.-- * * * if a domestic corporation elects the application of this section * * * there shall be allowed as a <u>credit</u> against the tax imposed by this chapter an amount equal to the portion of the tax which is attributable to the sum of--
>
>         (A) the <u>taxable income</u>, from sources without the United States, from--
>
>             (i) the active conduct of a trade or business within a possession of the United States, or
>
>             (ii) the sale or exchange of substantially all of the assets used by the

taxpayer in the active conduct of such trade or business, and

(B) the qualified possession source investment income.

\* \* \* \* \* \* \*

(d) Definitions and Special Rules.--For purposes of this section--

\* \* \* \* \* \* \*

(2) Qualified Possession Source Investment Income.--The term "qualified possession source investment income" means gross income which--

(A) is from sources within a possession of the United States in which a trade or business is actively conducted, and

(B) the taxpayer establishes to the satisfaction of the Secretary is attributable to the investment in such possession (for use therein) of funds derived from the active conduct of a trade or business in such possession, or from such investment,

less the deductions properly apportioned or allocated thereto. [Emphasis added.]

Section 936(h) provides the following:

SEC. 936(h). <u>Tax Treatment of Intangible Property Income</u>.--

\* \* \* \* \* \* \*

(3) Intangible property income.--For purposes of this subsection--

(A) In general.--The term "intangible property income" means the gross income of a corporation attributable to any intangible property \* \* \*

(B) Intangible property.--The term "intangible property" means any--

(i)  patent, invention, formula, process, design, pattern, or knowhow;

\*      \*      \*      \*      \*      \*      \*

(iii)  trademark, trade name, or brand name;

(iv)  franchise, license, or contract;

(v)  method, program, system, procedure, campaign, survey, study, forecast, estimate, customer list, or technical data; \* \* \*

\*      \*      \*      \*      \*      \*      \*

which has substantial value independent of the services of any individual.

\*      \*      \*      \*      \*      \*      \*

(5)  Election out.--

\*      \*      \*      \*      \*      \*      \*

(C)  Methods of computation of taxable income.--If an election of one of the following methods is in effect pursuant to subparagraph (F) with respect to a product or type of service, an electing corporation shall compute its income derived from the active conduct of a trade or business in a possession with respect to such product or type of service in accordance with the method which is elected.

\*      \*      \*      \*      \*      \*      \*

(ii)  Profit split.--

(I)  General rule.--If an election of this method is in effect, the electing corporation's taxable income derived from the active conduct of a trade or business in a possession with respect to units of a product produced \* \* \*, in whole or in part, by the electing corporation shall be equal to 50 percent of the combined taxable

income of the affiliated group (other than foreign affiliates) derived from covered sales of units of the product produced * * *, in whole or in part, by the electing corporation in a possession.

(II) <u>Computation of combined taxable income.</u>--Combined taxable income shall be computed separately for each product produced * * *, in whole or in part, by the electing corporation in a possession.  Combined taxable income shall be computed (notwithstanding any provision to the contrary) for each such product * * * by deducting from the gross income of the affiliated group (other than foreign affiliates) derived from covered sales of such product * * * all expenses, losses, and other deductions properly apportioned or allocated to gross income from such sales * * * and a ratable part of all expenses, losses, or other deductions which cannot definitely be allocated to some item or class of gross income, which are incurred by the affiliated group (other than foreign affiliates). * * *

*     *     *     *     *     *     *

(7)  Regulations.--The Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the purposes of this subsection * * * [Emphasis added.]

In the simplest terms, section 936(a) allows for a tax credit.  The amount of this credit is equal to the portion of tax attributable to the "taxable income" derived from conducting business in a possession.  Section 936(h) determines the treatment of intangible property income.  Intangible property is broadly defined in section 936(h) and includes, of relevance

here, formulas, processes, trademarks, trade names, brand names, franchises, licenses and contracts, methods, programs, systems, procedures, campaigns, surveys, studies, forecasts, customer lists, and technical data. Sec. 936(h)(3)(B)(i),(iii), (iv), (v). The formula for beverage bases or concentrates for various soft drinks and syrups is considered intangible property under section 936(h)(3)(B). See also sec. 1.936-5(a), A-6, Example (1)(A), Income Tax Regs.

In the absence of an election under section 936(h)(5), intangible property income is taxed to the U.S. shareholders of the possessions corporation. If a possessions corporation makes a valid election, its active trade or business income with respect to the product for which the election is made is computed in accordance with the method elected. CRI elected the "profit-split" method under section 936(h)(5)(C)(ii).

Under the profit-split method, the taxable income of the "electing corporation", with respect to a product produced in a possession, is deemed to be 50 percent of the "combined taxable income" of the "affiliated group" derived from sales of the product to nonaffiliates or to foreign affiliates.[3] The

_____

[3]The term "electing corporation" means a domestic corporation for which an election under sec. 936 is in effect. Sec. 936(h)(5)(E). The term "affiliated group" means the electing corporation and all other organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interest, within
(continued...)

remaining 50 percent of the combined taxable income is allocated to, and treated as, the taxable income of the appropriate U.S. affiliate or affiliates. Sec. 936(h)(5)(C)(ii)(I), (III). Combined taxable income equals the gross income of the section 936 corporation and its U.S. affiliates derived from sales of the possession product to nonaffiliates or foreign affiliates less the expenses of the section 936 corporation and the U.S. affiliates allocated and apportioned to such gross income. Sec. 936(h)(5)(C)(ii)(II). Thus, the section 936 credit equals the tax attributable to 50 percent of the combined taxable income figure.

Congress recognized in enacting section 936(h) that some section 936 corporations produce products that are not sold as such to unrelated parties, but rather are transferred to affiliates and used as component parts in the production of other products that are then sold by the affiliates to unrelated parties. Congress directed the Secretary of the Treasury to write the rules with respect to such component products. Section 936(h)(7) requires the Secretary to prescribe such regulations as may be necessary and appropriate to carry out the purposes of section 936(h).

Section 1.936-6, Income Tax Regs., provides the following:

---

[3](...continued)
the meaning of sec. 482. Sec. 936(h)(5)(C)(i)(I)(b).

(b) Profit split option--(1) Computation of combined taxable income.

Question 1: <u>In determining combined taxable income from sales of a possession product, how are the allocations and apportionments of expenses, losses, and other deductions to be determined?</u>

Answer 1: (i) <u>Expenses, losses, and other deductions are to be allocated and apportioned on a "fully-loaded" basis under § 1.861-8 to the combined gross income of the possessions corporation and other members of the affiliated group * * *</u> The amount of research, development, and experimental expenses allocated and apportioned to combined gross income is to be determined under § 1.861-8(e)(3). * * * Other expenses which are subject to § 1.861-8(e) are to be allocated and apportioned in accordance with that section. For example, interest expense * * * is to be allocated and apportioned under § 1.861-8(e)(2). With the exception of marketing and distribution expenses discussed below, the other remaining expenses which are definitely related to a class of gross income shall be allocated to that class of gross income and shall be apportioned on the basis of any reasonable method, as described in § 1.861-8(b)(3) and (c)(1). Examples of such methods may include, but are not limited to, those specified in § 1.861-8(c)(1)(i) through (vi).

*     *     *     *     *     *     *

Question 12: <u>If the possession product is a component product</u> or an end-product form, how is the combined taxable income for such product to be determined?

Answer 12: (i) In computing combined taxable income, the sales price of the component product * * * is determined as follows. With respect to a component product, an independent sales price from comparable uncontrolled transactions must be used if such price can be determined in accordance with sec. 1.482-2(e)(2). If an independent sales price of the component product from comparable uncontrolled transactions cannot be determined, then the possessions corporation must treat the sales price for the component product as equal to the same proportion of the third party sales price of the integrated product which the production costs attributable to the

component product bear to the total production costs
for the integrated product. * * *

(ii) * * * The possessions corporation will determine
its costs * * * attributable to the possession product and
its expenses allocable and apportionable to the possession
product under sec. 1.861-8, as described in question and
answer 1  * * *

Each member of the affiliated group that is a
United States person, other than the possessions
corporation, shall determine its costs (other than
costs incurred for materials purchased from a U.S.
affiliate) attributable to the possession product, and
its expenses allocable and apportionable to the
integrated product under sec. 1.861-8, as described in
question and answer 1 of this paragraph (b)(1).  Each
such United States person (other than the possessions
corporation) shall apportion to the possession product,
on the basis of the ratio of the production costs for
the possession product to the total production costs
for the integrated product, the expenses that such
affiliate allocated and apportioned to the integrated
product.  * * *  [Emphasis added.]

For purposes of computing combined taxable income, section

1.936-6(b)(1), Q&A-1, Income Tax Regs. (Q&A-1), governs the

computation of combined taxable income by prescribing rules for

the allocation and apportionment of expenses derived from the

sale of a possession product sold to unrelated third parties in

unchanged form.  Q&A-12, on the other hand, appears to govern the

computation of combined taxable income by prescribing rules for

the allocation and apportionment of expenses derived from the

sale of a product sold to unrelated third parties which contains

a component possession product.

## B.  Parties' Positions

Respondent first argues that Q&A-1 governs in the instant case, requiring that all expenses USA incurs and those CBO expenses that are <u>factually related</u> to gross income from the sale of concentrate be apportioned in full to such income regardless of the form in which the possession product is sold.  Second, respondent argues in the alternative that even were Q&A-12 controlling in the instant case, the application of the production cost ratio contained in Q&A-12 produces absurd results, and petitioner's motion should be denied on the basis of <u>Exxon Corp. v. Commissioner</u>, 102 T.C. 721 (1994).  Respondent maintains that the question before this Court is whether Congress intended the results that flow from petitioner's application of the production cost ratio (PCR) to the U.S. affiliates' expenses known to be factually related to the gross income derived from CRI's component concentrate.

Respondent argues further that the factual relationship test found in section 1.861-8(b) and (c), Income Tax Regs., is adopted in section 936(h)(5)(C)(ii)(II) through its overall incorporation of the standards contained in section 861.  Respondent claims that Q&A-12 must be read in the context of the statute and is to be applied only as a supplement to Q&A-1, which determines, according to respondent, the expenses allocable and apportionable to the possession product in all cases including those cases in which the possession product is sold in a component form.

A possession product is an item of property which is the result of a production process carried on in a possession. Sec. 1.936-5(a), A-1, Income Tax Regs. Possession products encompass component products, integrated products, and end-product forms. Id. A component product is a product which is subject to further processing before sale to an unrelated party. Id. An integrated product is (1) a product not subject to any further processing before sale to an unrelated party and (2) a product which includes all component products from which it is produced. Id. A possessions corporation may treat a component product or an integrated product as its possession product even though the final stage or stages of production occur outside the possession. Id. Further processing includes transformation, incorporation, assembly, or packaging. Id. For our purposes, the integrated product is syrup or soft drinks, the component product is concentrate, and the possession product is the component concentrate. Again, CRI is both the possessions corporation and the electing corporation within the meaning of section 936.

CRI incurs costs in producing and shipping concentrate to the United States. Production costs include direct labor costs and overhead incident to and necessary for production but do not include direct material costs and interest. Secs. 1.936-6(b)(1), Q&A 12, 1.936-5(b)(4), 1.471-11(b), Income Tax Regs. USA and the CBO's incur expenses in selling the syrup and soft drinks. U.S. affiliate expenses allocable and apportionable to the integrated

product, i.e., syrup and soft drink, are determined under section 1.861-8, Income Tax Regs., as described in section 1.936-6(b)(1), Q&A-1, Income Tax Regs. These expenses include, inter alia, research and development, experimental, interest, marketing, distribution, and advertising expenses. Sec. 1.936-6(b)(1), Income Tax Regs.

We provide the following examples for illustration:

Example 1

When petitioner sells concentrate as concentrate, i.e., in unchanged form, to unrelated third parties, CTI is determined as follows:

| Item | Amount |
|------|--------|
| Gross income from the sale of concentrate per unit[1] | $2.24 |
| Total USA expenses | (1.48) |
| Combined taxable income | .76 |

[1]Concentrate is sold in units; syrup and soft drinks are sold in equivalent gallons.

In this example, the PCR is not applicable because the concentrate is being sold in unchanged form and not as a component of something larger. Here, Q&A-1 determines the computation of CTI, requiring that all expenses factually related to the concentrate be allocated and apportioned in full to the income derived from the sale of the concentrate as concentrate. Thus, 50 percent of the CTI is 38 cents per unit, resulting in a

tax credit equal to the tax attributable to 38 cents per unit of concentrate sold.

<u>Example 2</u>

When the concentrate is sold as a component of a beverage product to unrelated third parties, CTI is determined as follows:

| <u>Item</u> | <u>Amount</u> |
|---|---|
| Gross income from the sale of concentrate as a component of syrup | $2.24 |
| Total USA expenses | (1.48) |
| Production costs incurred per unit of possession product | .10 |
| Total production costs incurred per unit of integrated product | .80 |
| PCR | 12.5% |
| Expense allocation after applying the PCR | <u>(.19)</u> |
| Combined taxable income | 2.05 |

If the possession product is a component product, as here, combined taxable income is determined under Q&A-12. The plain language of Q&A-12 requires (1) the determination of five factors relating to sales, costs, and expenses and (2) the application of those factors when using the allocation and apportionment method provided therein. The five factors to be determined under Q&A-12 are as follows:

(1) The electing corporation must determine the sale price of the component product. The sale price is derived from either

an independent sale price from comparable uncontrolled transactions, or if an independent sale price from comparable uncontrolled transactions cannot be determined, then the sale price is determined using a production cost ratio method. This first requirement is not at issue for purposes of the instant motion;

(2) the possessions corporation must determine its costs attributable to the possession product under section 1.861-8, Income Tax Regs.;

(3) the possessions corporation must determine its expenses allocable and apportionable to the possession product under section 1.861-8, Income Tax Regs.;

(4) each member of the affiliated group must determine its costs attributable to the possession product under section 1.861-8, Income Tax Regs; and

(5) each member of the affiliated group must determine its expenses allocable and apportionable to the integrated product under section 1.861-8, Income Tax Regs.

Finally, Q&A-12 requires that each affiliate apportion to the possession product on the basis of the ratio of the production costs for the possession product to the total production costs for the integrated product, the expenses the affiliate allocated and apportioned to the integrated product.

In our second example, the total production costs associated with the integrated product equal 80 cents per unit, and the

production costs associated with the possession product equal 10 cents per unit, resulting in a PCR of 12.5 percent. The PCR is then applied to the total expense amount of $1.48 per unit, resulting in approximately 19 cents per unit expense allocation. The CTI equals $2.05 per unit, resulting in a tax credit equal to the tax attributable to approximately $1.03 per unit of beverage product sold.

In this example, only 12.5 percent of the expenses known to be factually related to the sale of the integrated product are allocated and apportioned to the income derived from the sale of the possession product. This results in an increased CTI figure, which in turn increases the amount of the section 936 possessions tax credit. Thus, where production costs at the possession level are small in relation to the total production costs, as in the instant case, a low PCR is produced, resulting in the allocation of a relatively small percentage of the total amount of expenses to the income derived from the sale of the possession product.

Respondent argues that the application of the PCR in the instant case results in unapportioned USA expenses totaling $227,213,515 in 1985, representing approximately 89.84 percent of the total amount of expenses for that year, and unapportioned expenses totaling $263,021,507 in 1986, representing 91.7 percent of the total expenses for that year.

Both parties acknowledge that regardless of the form in which the concentrate is sold, i.e., one unit of concentrate,

79.26 gallons of syrup, or 515 gallons of soft drink, petitioner incurs approximately the same amount of expense with respect to each product.  Petitioner argues, however, that the regulations under section 936 contain only one provision prescribing the manner of calculating combined taxable income with respect to a component product; i.e., Q&A-12.  Under the plain meaning of this regulation, Q&A-12 controls the computation of combined taxable income with respect to possession products that are component products, according to petitioner.  The concentrate produced by CRI, which is converted into syrup or into bottle and can soft drinks before sale to unrelated parties, is a component product. According to petitioner, under the plain, unambiguous terms of the regulation, Q&A-12 governs the computation of combined taxable income with respect to such concentrate, mandating the application of the production cost ratio.

Petitioner further asserts that the application of Q&A-12 to component concentrate is consistent with the regulatory scheme in general.  In petitioner's view, the language in the question portion of Q&A-12 is broad and unqualified, and nothing in the regulations under section 936 indicates that any other rules may apply with respect to component products, according to petitioner.

Petitioner argues that the language in Q&A-12 clearly states that the role of Q&A-1, with respect to component products, is to determine U.S. affiliate expenses at the integrated product

level; i.e., to determine the aggregate of U.S. affiliate expenses allocable and apportionable to the gross income from the integrated product containing the component product. Q&A-12 then prescribes the PCR as the exclusive basis for allocating and apportioning those expenses to the component possession product. Petitioner argues that under the plain meaning of the regulation, the PCR applies to all U.S. affiliate expenses allocable and apportionable to the integrated product; i.e., syrup and soft drinks.

Furthermore, argues petitioner, the example in Q&A-12 confirms this interpretation. In the example, expenses of the U.S. affiliates are allocated and apportioned to the integrated product, computers, and then apportioned to the component product, central processing units, using the PCR. Thus, petitioner argues, the example provided in Q&A-12 supports the plain meaning of the regulation.

Respondent contends that on the facts before us, section 936(h)(5)(C)(ii)(II), as interpreted by Q&A-1, requires that all expenses that USA incurs, and those CBO expenses that are factually related to concentrate gross income, be apportioned in full to such income. Respondent argues that Congress did not intend the results that flow from petitioner's application of the PCR to U.S. affiliates' expenses known to be factually related to, and therefore allocable and apportionable solely to, the gross income derived from CRI's component concentrate. With

respect to expenses incurred by petitioner's corporate and USA divisions, the amount of expenses apportionable to CRI's component concentrate gross income can be precisely quantified, according to respondent. Petitioner concedes, for purposes of the instant motion, that USA incurred approximately the same amount of expense, on a per-gallon basis, regardless of whether USA sold the concentrate to third parties in its integrated form or in its unchanged form. Thus, respondent argues that USA expenses factually attributable to the concentrate must be allocated and apportioned in full to such concentrate regardless of whether it is sold in an unchanged form or in a component form.

According to respondent, section 936(h)(5)(C)(ii)(II) governs all computations of combined taxable income and adopts a facts-and-circumstances test for apportioning U.S. affiliates' expenses to the gross income derived from covered sales of a possession product regardless of the form in which the possession product is sold.[4] Congress mandated this approach, argues respondent, by enacting language borrowed directly from section 861. Respondent argues that the phrase "properly apportioned or allocated" is a term of art borrowed verbatim from section 861(b), and enactment of this particular phrase should be

---

[4]The term "covered sales" means sales by members of the affiliated group (other than foreign affiliates) to persons who are not members of the affiliated group or to foreign affiliates. Sec. 936(h)(5)(C)(ii)(IV).

interpreted as a directive from Congress to apply the section 1.861-8, Income Tax Regs., expense allocation and apportionment regime in performing CTI computations.

The principles under section 1.861-8, Income Tax Regs., require that all deductions must be allocated to the class or classes of gross income to which they are factually related. Deductions are incurred with respect to activities and properties that generate particular classes of gross income, or which generate all classes of gross income, and that are definitely related to those classes of gross income.

These principles, according to respondent, require that deductions be apportioned between gross income derived from the possession product (the statutory grouping) and other gross income (the residual grouping) using a method that reasonably reflects the factual relationship between the deductions and the income assigned to the grouping. Respondent contends that section 936(h)(5)(C)(ii)(II) adopts a method of apportioning expenses to possession product gross income which turns upon factual relationships. Petitioner's alleged misapplication of the PCR causes gross misapportionments, according to respondent.

Petitioner argues that the plain meaning of Q&A-12 is consistent with the language and purpose of section 936(h)(5)(C)(ii)(II). Petitioner contends that section 936(h)(5)(C)(ii)(II) provides only general principles for component products and does not provide specific guidance for

determining the taxpayer's expense, losses, and other deductions that are properly allocated and apportioned to the gross income derived from sales of a component possession product.  Indeed, there is no specific reference anywhere in section 936(h) to component possession products or the computation of CTI with respect to component possession products, asserts petitioner.

Section 936(h)(7) authorizes and directs the Secretary to prescribe such regulations as may be necessary or appropriate to carry out the purposes of section 936(h), and, according to petitioner, Q&A-12 is the provision the Secretary chose to prescribe to fill the statutory gap.  Thus, petitioner argues, respondent chose to (1) make Q&A-12 the exclusive procedure for computing CTI with respect to component possession products and (2) chose to use a formulary apportionment method in order to make such computation.  Undoubtedly, other procedures for computing CTI for component possession products could have been prescribed, and other procedures might be thought by some to produce "better" results, argues petitioner.  The procedures adopted in Q&A-12 were chosen, however, and are fully consistent with the language and purpose of section 936(h)(5)(C)(ii)(II).[5]

---

[5]Other procedures were recommended to the Treasury and IRS, and another procedure has been proposed by the Commissioner for taxable years beginning after 1993.  Under the proposed amendment, CTI for a component possession product is determined by applying the PCR to the CTI for the integrated product containing the component possession product.  See Notice of Proposed Rulemaking, 59 Fed. Reg. 1690 (Jan. 12, 1994).

Petitioner argues that having prescribed an allocation and apportionment procedure that could either favor or disfavor a taxpayer, depending on the circumstances, respondent should not be permitted to selectively enforce the provision by challenging its application for particular taxpayers. Petitioner acknowledges that it obtains favorable results by applying Q&A 12 as written. The results produced by applying Q&A-12, however, do not justify overriding the plain language of the regulation. Petitioner contends that a plain and unambiguous provision may be judicially overridden only if it produces grossly or patently absurd results.

Respondent argues that petitioner's interpretation of Q&A-12 improperly limits the role of Q&A-1, contrary to clear indications that Q&A-1 must be accorded a broad scope. Respondent contends that petitioner's interpretation of Q&A-12 is plainly at odds, not only with the express broad terms of Q&A-1, but also with section 936. Q&A-1 is intended to state the standards by which all expenses attributable to the possession product must be allocated and apportioned regardless of the form in which the possession product is sold to the third parties, asserts respondent. Q&A-1 must be given a broad scope of application in making allocations and apportionments of expenses directly to the possession products in all situations where expenses can be so apportioned using the methods provided in section 1.861-8, Income Tax Regs. Respondent argues that in

apportioning expenses to component possession product gross income, the PCR of Q&A-12 plays a complementary and supportive role, not an exclusive role.

Furthermore, respondent contends that the example in Q&A-12 is merely illustrative and does not authorize petitioner's interpretation.  Illustrative examples must be interpreted so as to effectuate the statutory language and purpose, according to respondent, and Q&A-12 must not be interpreted in a manner which restricts or conflicts with the statute or with Q&A-1. Respondent contends that if an example in the regulations is inconsistent with the text of the regulation, the example must yield and the regulatory text is given effect.

Petitioner argues that the plain meaning of Q&A-12 does not unduly restrict the scope of Q&A-1.  Q&A-12 complements Q&A-1 by prescribing the method by which CTI is computed for possession products sold in component form.  Q&A-1 provides rules for allocating and apportioning U.S. affiliate expenses with respect to sales of possession products in general; Q&A-12 provides rules prescribing the manner in which U.S. affiliate expenses are to be allocated and apportioned with respect to component possession products.

C.  Analysis:  Legislative Regulations Generally

First, we must determine the roles that Q&A-1 and Q&A-12 play in the instant case.  After determining which provision plays the primary role, we must then determine, under section

936, the manner of computing combined taxable income and the method by which expenses are to be allocated and apportioned under the facts of the instant case.

There is no specific reference anywhere in section 936(h) to component products or the computation of combined taxable income with respect to component products. The computation of combined taxable income with respect to component possession products under the profit-split method is prescribed in Q&A-12. The formulary apportionment method prescribed in Q&A-12 determines the manner in which U.S. affiliate expenses are apportioned to the gross income derived from covered sales of the component possession product.

Section 1.936-6(b)(1), Income Tax Regs., was promulgated pursuant to a specific statutory grant of authority under section 936(h)(7). Where the Commissioner acts under a specific grant of authority, our primary inquiry is whether the regulation is not contrary to the statute and is not arbitrary or capricious. Rowan Cos. v. United States, 452 U.S. 247 (1981); Florida Manufactured Housing Association, Inc. v. Cisneros, 53 F.3d 1565, 1572 (11th Cir. 1995); CWT Farms, Inc. v. Commissioner, 755 F.2d 790, 800 (11th Cir. 1985), affg. 79 T.C. 86 (1982).

Congress' delegation of rulemaking power was expressed in S. Rept. 960, 70th Cong., 1st Sess. (1928), 1939-1 C.B. (Part 2) 409, 419, as follows:

> The Committee believes it to be impractical to attempt by legislation to prescribe the various detailed and complicated rules necessary to meet the many differing and complicated situations.  Accordingly, it has found it necessary to delegate power to the Commissioner to prescribe regulations legislative in character covering them.  * * *

See also Tate & Lyle, Inc. & Subs. v. Commissioner, 103 T.C. 656 (1994).

Section 1.936-6(b), Income Tax Regs., is a legislative regulation containing substantive rules.  As such, the regulation is entitled to greater weight and deference than an interpretive regulation issued pursuant to the Commissioner's general grant of authority to prescribe needful rules and regulations under section 7805(a).  CWT Farms, Inc. v. Commissioner, supra at 800; Tate & Lyle, Inc. & Subs. v. Commissioner, supra at 666; Perkin-Elmer Corp. & Subs. v. Commissioner, 103 T.C. 464 (1994).

A legislative regulation is made pursuant to a specific grant of authority, often without precise congressional guidance, to define a statutory term or prescribe a method of executing a statutory provision.  Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-844 (1984); Anderson, Clayton & Co. v. United States, 562 F.2d 972 (5th Cir. 1977).

In section 936(h)(7), Congress has delegated to the Commissioner authority to act in an essentially legislative manner to fill in the gaps of the statute.  If the Commissioner's interpretation is reasonable, it will not be supplanted with our own.  Florida Manufactured Housing Association, Inc. v. Cisneros,

supra at 1571-1572; see United States v. Cartwright, 411 U.S. 546, 550 (1973); RJR Nabisco, Inc. v. United States, 955 F.2d 1457, 1464 (11th Cir. 1992).

In Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., supra at 842-843, the Supreme Court stated the following:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions.  First, always, is the question whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.  If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation.  Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.  [Emphasis added; fn refs. omitted.]

Our primary inquiry in the case of a legislative regulation is whether the interpretation or method prescribed therein is within the delegation of authority.  Regardless of whether the regulation at issue is legislative or interpretive, it is appropriate to ascertain whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose in order to determine whether the regulation carries out the congressional mandate in a proper manner.  United States v. Vogel Fertilizer Co. 455 U.S. 16, 24-26 (1982); CWT Farms, Inc. v. Commissioner, supra at 801.

As legislative regulations are essentially substantive rules of law, the rules of interpretation applicable to statutes are appropriate tools of analysis. KCMC, Inc. v. FCC, 600 F.2d 546, 549 (5th Cir. 1979); Intel Corp. & Consol. Subs. v. Commissioner, 100 T.C. 616, 630 (1993), affd. 67 F.3d 1445 (9th Cir. 1995); Phillips Petroleum Co. v. Commissioner, 101 T.C. 78, 97 (1993), affd. without published opinion ___F.3d___ (10th Cir., Nov. 28, 1995). Statutes are to be construed so as to give effect to their plain and ordinary meaning unless to do so would produce an absurd result. Green v. Bock Laundry Machine Co., 490 U.S. 504, 509 (1989); United States v. NEC Corp., 931 F.2d 1493, 1498 (11th Cir. 1991); Blue Cross & Blue Shield v. Weitz, 913 F.2d 1544, 1548 (11th Cir. 1990); Exxon Corp. v. Commissioner, 102 T.C. 721 (1994).

Where a statute is clear on its face, we require unequivocal evidence of legislative purpose before construing the statute so as to override the plain meaning of the words used therein. Halpern v. Commissioner, 96 T.C. 895 (1991). All parts of a statute must be read together, and each part should be given its full effect. D. Ginsberg & Sons, Inc. v. Popkin, 285 U.S. 204, 208 (1932); Estate of Dupree v. United States, 391 F.2d 753, 757 (5th Cir. 1968); McNutt-Boyce Co. v. Commissioner, 38 T.C. 462, 469 (1962), affd. per curiam 324 F.2d 957 (5th Cir. 1963). Unless exceptional circumstances dictate otherwise, when we find the terms of a statute unambiguous, judicial inquiry is complete.

Burlington N. R.R. v. Oklahoma Tax Commn., 481 U.S. 454, 461 (1987); United States v. NEC Corp., supra at 1498.

Thus, the party who seeks to convince a court to adopt a reading of a statute which is at odds with its plain meaning labors under a heavy burden. United States v. NEC Corp., supra at 1499.

Consistent with the foregoing, we examine the historical development of section 936 and determine whether the regulation implements the congressional mandate in a reasonable manner.

D.  Analysis:  Section 1.936-6(b)(1), Q&A-1 & -12, Income Tax Regs.

Section 936 has its genesis in section 262 of the Revenue Act of 1921, ch. 136, 42 Stat. 271, which exempted a U.S. corporation from Federal taxes on foreign-source income if it derived at least 80 percent of its income from sources within a possession and satisfied certain other requirements.  The requirements for exemption from tax as a possessions corporation were carried forward without material change into section 931 of the Internal Revenue Code of 1954.  In the Tax Reform Act of 1976, Congress eliminated the exemption and in its place enacted the tax credit mechanism of section 436.  Tax Reform Act of 1976, Pub. L. 94-455, sec. 1051, 90 Stat. 1643.

Congressional intent for section 931 and its predecessors consistently has been the encouragement of American business investments in possessions of the United States.  American

companies operating in the possessions originally were subjected
to double taxation by the imposition of both the Federal
corporate income tax and the taxes levied by the possessions
governments.  Tariff Act of 1913, ch. 16, sec. II, 38 Stat. 166;
Revenue Act of 1918, ch. 18, 40 Stat. 1058.

Congress perceived that the tax burden so created placed
American businesses at a competitive disadvantage when compared
with their British and French counterparts not subject to
taxation upon the profits they earned abroad unless paid back to
the home company.  Congress consequently enacted the original
version of section 931 to remove that competitive disadvantage.
H. Rept. 350, 67th Cong., 1st Sess. 1 (1921), 1939-1 C.B. (Part
2) 168, 174.

Section 931 provided corporations an exclusion for
possession-source income if they met the "80-percent source" test
and the "50-percent active trade or business" test.[6]  Because of

---

[6]Sec. 931 provided as follows:

SEC. 931. INCOME FROM SOURCES WITHIN POSSESSIONS
          OF THE UNITED STATES.

(a) General Rule.--In the case of
citizens of the United States or domestic
corporations, gross income means only gross
income from sources within the United States
if the conditions of both paragraph (1) and
paragraph (2) are satisfied:

(1) Three-year period.--If 80 percent or
more of the gross income of such citizen or
domestic corporation (computed without the

(continued...)

the exclusion, and because dividends received by a domestic corporation from its wholly owned possessions subsidiary were not eligible for the intercorporate dividends received deductions under section 246(a)(2)(B), possessions corporations amassed large amounts of income not repatriated to the United States.

To encourage investment of possessions-source earnings in the United States, Congress, in 1976, enacted section 936. Tax Reform Act of 1976, Pub. L. 94-455, sec. 1051, 90 Stat. 1643. The Tax Reform Act of 1976 revised prior law, providing for a more efficient system for exemption of possessions corporations in order to prevent the possessions from losing a significant source of capital. In place of the exemption mechanism contained in section 931, section 936 permits a U.S. corporation to elect a tax credit to offset the U.S. tax on its possessions income.

---

[6](...continued)
              benefit of this section) for the  3-year
              period immediately preceding the close of the
              taxable year (or for such  part of such
              period immediately preceding the close of
              such taxable year as may be applicable) was
              derived from sources within a possession of
              the United States; and

                   (2) Trade or business.--If--

                   (A) in the case of such
              corporation, 50 percent or more of its
              gross income (computed without the
              benefit of this section) for such period
              or such part thereof was derived from
              the active conduct of a trade or
              business within a possession of the
              United States * * *

Thus, the current version of the investment incentive takes the form of a tax credit rather than an exemption.

It is clear from the legislative record that Congress was aware of the highly favorable tax benefits afforded U.S. corporations operating in Puerto Rico.  It is equally clear that Congress intended to retain and reaffirm such tax benefits by enacting section 936.  The Senate Finance Committee and the House of Representatives Committee on Ways and Means stated the following, in virtually identical reports:

> The special exemption provided (under sec. 931) in conjunction with investment incentive programs established by possessions of the United States, especially the Commonwealth of Puerto Rico, have been used as an inducement to U.S. corporate investment in active trades and businesses in Puerto Rico and the possessions.  Under these investment programs little or no tax is paid to the possessions for a period as long as 10 to 15 years and no tax is paid to the United States as long as no dividends are paid to the parent corporation.
>
> Because no current U.S. tax is imposed on the earnings if they are not repatriated, the amount of income which accumulates over the years from these business activities can be substantial.  The amounts which may be allowed to accumulate are often beyond what can be profitably invested within the possession where the business is conducted.  As a result, corporations generally invest this income in other possessions or in foreign countries either directly or through possessions banks or other financial institutions.  In this way possessions corporations not only avoid U.S. tax on their earnings from  businesses conducted in a possession, but also avoid U.S. tax on the income obtained from reinvesting their business earnings abroad.
>
> The committee after studying the problem concluded that it is <u>inappropriate to disturb the existing relationship between the possessions</u>

> investment incentives and the U.S. tax laws because of the important role it is believed they play in keeping investment in the possessions competitive with investment in neighboring countries. * * * [S. Rept. 94-938, at 277-278 (1976), 1976-3 C.B. (Vol. 3) 57, 315-316; H. Rept. 94-658 (1975), 1976-3 C.B. (Vol. 2) 945, 946-947; emphasis added.]

Thus, under both section 936 and its predecessor section 931, possessions corporations are and have been effectively exempt from tax on income from possessions sources. This exemption applied to income from intangibles created by such corporation or acquired from an unrelated party. In 1982, Congress added subsection (h) to section 936.[7] Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, sec. 213, 96 Stat. 452. Subsection (h) was added in order to lessen the abuse caused by taxpayers claiming tax-free income generated by intangibles developed outside of Puerto Rico. See H. Conf. Rept. 97-760, at 505 (1982), 1982-2 C.B. 600, 617.

Section 936(h)(1) provides that any income of an electing corporation attributable to intangible property is deemed to be the income of, and is taxable to, the shareholders of the section 936 corporation. Where income is derived from the sale of an intangible possessions product, taxable income generally is computed under section 936(b)(1)-(4). A section 936 corporation

---

[7]Sec. 936(h) was added to the Code in response to issues raised in Eli Lilly & Co. v. Commissioner, 84 T.C. 996 (1985), affd. in part, revd. in part and remanded 856 F.2d 855 (7th Cir. 1988). See H. Conf. Rept. 97-760, at 504 n.* (1982), 1982-2 C.B. 600, 617.

may, however, "elect out" under section 936(h)(5) and choose to compute its taxable income under one of two methods:  (1) The cost-sharing method; or (2) the profit-split method.  Pursuant to either method, the stockholders of the section 936 corporation are taxed on a share of the income generated from intangible assets.

Congress recognized in enacting section 936(h) that some section 936 corporations produce products that are not sold to unrelated parties, but rather are transferred to affiliates and used as component parts in the production of other products that are then sold by the affiliates to unrelated parties.  The statute, however, does not provide any specific rules for the computation of combined taxable income in such a case.  Rather, Congress directed the Treasury to write the rules with respect to such component products.  Sec. 936(h)(7).  The conference report accompanying the enactment of section 936(h) instructs the Secretary to:

> prescribe regulations providing for  appropriate treatment in cases where the island affiliate * * * produces a component which it sells to an affiliate for incorporation into a product sold to third parties. [H. Conf. Rept. 97-760, supra at 508, 1982-2 C.B. at 619.[8]]

We conclude that section 1.936-6(b)(1) Q&A-12, Income Tax Regs., establishes a permissible method for computing CTI where

---

[8]Sec. 936(h)(7) was redesignated as sec. 936(h)(8) by the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, sec. 1012(h)(2)(B), 102 Stat. 3502.

the possession product is a component product. In evaluating the regulations under section 936, we are mindful of the Supreme Court's admonition: "The choice among reasonable interpretations is for the Commissioner, not the courts." National Muffler Dealers Association, Inc. v. United States, 440 U.S. 472, 488 (1979). Provided that Q&A-12 is neither unreasonable nor plainly inconsistent with the statute, it will be upheld. Bingler v. Johnson, 394 U.S. 741, 750 (1969); RJR Nabisco, Inc. v. United States, 955 F.2d at 1464.

The legislative history of section 936, as a whole, is silent on the precise issue before us. The legislative history does, however, make clear Congress' consistent intention to maintain the favorable tax benefit of operating in a U.S. possession, and we find that the application of the PCR in Q&A-12 in the instant case is fully consistent with that intention.

The regulatory scheme under section 936 is technical and complex, and we find that the Commissioner considered the treatment of possession products in a detailed and reasoned fashion before making a final decision.[9] Section 936 does not specifically define the term "CTI", nor does the statute provide a clear method for allocating and apportioning expenditures in

[9]As is customary, the IRS invited interested members of the public to submit written comments with respect to proposed regulations interpreting sec. 936 as amended by the Tax Equity and Fiscal Responsibility Act of 1982. Numerous comments were received and considered. See 47 Fed. Reg. 53746 (Nov. 29, 1982).

computing CTI under the facts before us. The term CTI, and the method for computing such, for purposes relevant here, however, is defined in Q&A-12. General language of a statutory provision will not be held to apply to a matter specifically dealt with in another part of the same enactment; specific terms prevail over the general. D. Ginsberg & Sons, Inc. v. Popkin, 285 U.S. at 208; Dupree v. United States, 391 F.2d 753, 758 (5th Cir. 1968).

Under the profit-split method, the electing corporation's taxable income derived from products produced in a possession equals 50 percent of the combined taxable income of the affiliated group derived from covered sales of these products. Sec. 936(h)(5)(C)(ii)(II). Combined taxable income is the gross income of the affiliated group derived from covered sales of the possession product less all expenses properly apportioned and allocated to such income.

Q&A-1 describes the proper allocation and apportionment of expenses in computing CTI with respect to soft-drink concentrate produced by CRI and sold by U.S. affiliates in unchanged form to unrelated bottlers. If, however, the possession product is simply a component of a final product, then Q&A-12 prescribes the manner of computing CTI.

Q&A-12 prescribes the method for determining CTI with respect to component products. Under that method, the expenses which the affiliated group allocated and apportioned to the integrated product, i.e., syrup and soft drink, must be further

apportioned to the possession product, i.e., the soft-drink concentrate. The latter apportionment is based on the ratio of the production costs for the possession product to the total production costs for the integrated product.

In using this formulaic method to arrive at CTI, it becomes clear that the greater the expense allocation to the concentrate, the lower the CTI, and, thus, the smaller the credit. Conversely, the lesser the expense allocation to the concentrate, the higher the CTI, and, thus, the greater the credit. In the example in Q&A 12, the taxpayer's PCR is 80 percent. This is because the production costs incurred at the possessions level are high relative to total production costs. Petitioner, however, has relatively low PCR's with respect to its component product, which, as stated earlier, results in a quite favorable tax benefit. The use of a formula will cut both ways; it will be beneficial to some and not so beneficial to others. That is the intrinsic nature of formulas.

Essentially, respondent is arguing that, at each level, the application of the PCR impermissibly misapportions away from the component concentrate expenses that are known and admitted to be factually related to the concentrate, which in turn inflates the CTI figure, causing the sheltering of post-allocation income. We find that the focus of respondent's argument appears to center on the wisdom of the choice between two alternatives; i.e., a formulaic versus a fact-based approach, rather than on whether

the choice made was a reasonable choice within a gap left open by Congress.

Q&A-12 contains no mention of "factual relationships" or "economic consequences". It merely provides a formula used in calculating CTI in order to determine the amount of credit under section 936. There is no doubt and no dispute that (1) petitioner qualifies for the section 936 credit, and (2) CRI made a valid election to use the profit-split method under section 936.

Currently, in response to the instant case, the Commissioner has opened a new regulation project regarding the computation of CTI under section 936(h). The proposed regulation contains, again, a formulary rather than a factual approach attacking the issue from the income side as opposed to the expense side. The proposed regulation makes no mention of factual relationships or economic reality.

We find that Q&A-12 is clear on its face, and respondent's strained interpretation of the relationship between Q&A-1 and Q&A-12 is merely an attempt to persuade this Court to retroactively revise the regulation. Until the regulation is changed, reflecting the Commissioner's proposed amendments to Q&A-12, taxpayers are entitled to the tax benefit generated under Q&A-12.

Additionally, we find that the formulaic method prescribed in Q&A-12 is consistent with Congress' intent to encourage

investment in U.S. possessions, and consequently, we find that Q&A-12 is not inconsistent with any stated congressional intent. Q&A-12 could have been written to require simply that expenditures be allocated and apportioned in a manner consistent with the rules set forth in section 1.861-6, Income Tax Regs., but it was not.

The fact that other methods might also be reasonable, or even preferable, however, does not warrant our overturning a regulation which itself has a reasonable basis. Brown & Root v. TVA, 681 F.2d 1313, 1316-1317 (11th Cir. 1982). Even presuming that we might disagree with the results of applying the PCR in the instant case, we would not substitute our own construction of the statute for that of the Secretary where the regulation implements the congressional mandate in a reasonable manner. See Florida Manufactured Housing Association, Inc. v. Cisneros, 53 F.3d at 1572-1573. Respondent may not ignore the requirements set forth in the plain language of the regulations any more than petitioner or other taxpayers. Intel Corp. & Consol. Subs. v. Commissioner, 100 T.C. at 630.

We cannot conclude that the regulation at issue presents an impermissible construction of section 936(h). The Commissioner was delegated the authority to make choices among reasonable alternatives in interpreting section 936(h) and did so.

After considering the regulation in light of the language of section 936(h) and the purpose behind it, we are satisfied that

section 1.936-6(b)(1) Q&A-12, Income Tax Regs., constitutes a valid exercise of the Secretary's regulatory authority. We conclude that Q&A-12 is the controlling provision in the instant case.

E. Exxon

Respondent argues in the alternative that this Court's opinion in Exxon Corp. v. Commissioner, 102 T.C. 721 (1994), provides an independent basis for denying the instant motion as the application of Q&A-12 to the facts of the instant case would cause absurd results. Petitioner, citing Abdalla v. Commissioner, 647 F.2d 487, 497 (5th Cir. 1981), affg. 69 T.C. 697 (1978), contends that the plain and unambiguous meaning of a provision may be overridden only in rare and exceptional circumstances where the result of giving the provision its plain and unambiguous meaning would be so absurd as to "shock the general moral or common sense" and be against clear legislative intent.

Petitioner argues that respondent's reliance on Exxon Corp. v. Commissioner, supra, is misplaced, and that respondent is essentially asking this Court to rewrite the applicable regulations. We agree. We find that Exxon Corp. is distinguishable from the instant case.

Exxon received a known and quantifiable amount of income from sales of natural gas in 1979. Exxon claimed a 22-percent depletion allowance on an amount larger than the actual sales

proceeds from that gas.  This larger amount against which the depletion allowance was taken was derived from determining gross income under the "representative market" or "field price" method under the regulations.  The issue in Exxon Corp. was the method of computing "gross income from the property" for purposes of the depletion allowance.  See sec. 613(a).  The statute itself was silent on this issue.  The regulation defined gross income in terms of the representative market or field price, which in that case produced hypothetical gross income far in excess of actual gas sales.

The Commissioner argued that Exxon was not entitled to a percentage depletion deduction based upon a hypothetical "gross income from the property", which exceeded Exxon's actual gross income from the sale of gas.  The Commissioner maintained that the "gross income from property", for purposes of percentage depletion, must not exceed the actual gross income from the sale of gas, and under those circumstances, the Commissioner was entitled to employ a net-back methodology in determining "gross income from the property".  Exxon argued that under the plain meaning of section 1.613-3(a), Income Tax Regs., it was required to compute its percentage depletion deduction by using the representative market or field price of the gas.

Section 611 allows a "reasonable allowance for depletion" in the case of oil and gas wells "according to the peculiar conditions in each case".  Section 613(a) provides for a

percentage depletion deduction based upon a percentage of a taxpayer's "gross income from the property".  Section 611(a) provides that reasonable depletion allowance in all cases is to be made under regulations prescribed by the Secretary.

Although the statute was silent as to the definition of "gross income from the property" as it related to the facts in Exxon Corp. v. Commissioner, supra, section 1.613-3(a), Income Tax Regs., provided that "gross income from the property" is:

> the amount for which the taxpayer sells the oil or gas in the immediate vicinity of the well.  If the oil or gas is not sold on the premises but is manufactured or converted into a refined product prior to sale, or is transported from the premises prior to sale, the gross income from the property shall be assumed to be equivalent to the representative market or field price of the oil or gas before conversion or transportation.

Exxon argued that, under the literal terms of section 1.613-3(a), Income Tax Regs., where the gas is transported from the premises prior to sale, the Commissioner cannot use a net-back methodology to determine gross income from the property.

The Commissioner argued that not only was Exxon's interpretation of the regulation at issue flawed, it also was inconsistent with the legislative history behind percentage depletion.  Exxon essentially argued that, under the ordinary or plain meaning rule, the literal terms of the regulation at issue must be followed without further analysis.

We held that the rules of statutory construction require us to determine whether the "plain meaning" of a regulation would

have a nonsensical result.  Exxon Corp. v. Commissioner, supra at
728.  We held further that the plain meaning rule does not
preclude an examination behind the literal terms of the language
at issue if the lack of such an examination would compel an odd
result.  Exxon Corp. v. Commissioner, supra at 728 (citing Public
Citizen v. United States, 491 U.S. 440, 454 (1989)).

We examined the legislative purpose and history of
percentage depletion to ascertain whether and to what extent the
statutory framework was consistent with a literal interpretation
of the regulation at issue.  In so doing, we found that the plain
meaning of the regulation, as applied to the facts before us in
Exxon Corp., was against clear and longstanding congressional
intent.

Accordingly, we found that in computing allowance for
percentage depletion, it was unreasonable for Exxon to determine
its 1979 "gross income from the property" for sales of natural
gas, after the gas was transported away from the wellhead, by the
method provided for in the last sentence of section 1.613-3(a),
Income Tax Regs., the representative market or field price
method, where those prices resulted in a "gross income from the
property" five times Exxon's actual contract sales revenue.

In the instant case, however, the only clear and consistent
congressional intent expressed with respect to the possession tax
credit regime is the encouragement of U.S. business operations in
U.S. possessions.  We do not find that the application of the

plain meaning of Q&A-12 in the instant case is inconsistent with this stated policy.  Indeed, no clear, longstanding congressional intent exists with respect to the issue presented in the instant case.

Many tax provisions provide for favorable tax results, and to conclude that a provision as applied is absurd simply because the tax benefit is substantial is unwarranted.  The results that flow from the use of the PCR in the instant case, while quite beneficial to petitioner, are not unreasonable or unsound and certainly do not shock the general moral or common sense.

Respondent argues that applying the PCR to apportion less than the full amount of the expenses known to be factually related to the component possession product causes absurd results.  The Commissioner, however, chose to implement a formulaic method; i.e., the PCR.  Formulas by their very nature are arbitrary, and their use is intended to minimize factual disputes.

Respondent asks this Court, in effect, to rewrite the regulations in order to avoid a result which Q&A-12 clearly requires.  Until Congress or the Secretary acts to modify the result of Q&A-12, we will apply Q&A-12 as written.

We find that Exxon Corp. v. Commissioner, supra, is distinguishable from the instant case and is therefore not dispositive of the instant motion.

III. Conclusion

Accordingly, we find that section 1.936-6(b)(1) Q&A 12, Income Tax Regs., (1) governs the computation of combined taxable income with respect to sales of component concentrate produced by CRI and sold by petitioner to unrelated third parties, (2) requires U.S. affiliate expenses to be allocated and apportioned to the component concentrate by applying the production cost ratio to all expenses allocable and apportionable to the integrated product, i.e., bottle and can soft drink, and (3) requires U.S. affiliate expenses allocable and apportionable to the integrated product, i.e., bottle and can soft drink, to be determined under section 1.861-8, Income Tax Regs., as described in section 1.936-6(b)(1), Q&A-1, Income Tax Regs.

We find further, on the basis of Bowater Inc. v. Commissioner, 101 T.C. 207 (1993), that petitioner is entitled to offset interest income against interest expense in determining the amount of interest deduction to be allocated and apportioned in computing combined taxable income under section 936 and section 1.861-8(e)(2), Income Tax Regs.

To reflect the foregoing,

                    An appropriate order

                    will be issued granting

                    petitioner's motion for

                    partial summary judgment.